UNITED STATES of America

v.

Mario RICCOBENE, Appellant in
No. 82–1399

v.

Joseph CIANCAGLINI, Appellant in
No. 82–1410

v.

Charles WARRINGTON, Appellant
in No. 82–1411

v.

Pasquale SPIRITO, Appellant in
No. 82–1412

v.

Joseph BONGIOVANNI, Appellant
in No. 82–1413

v.

Harry RICCOBENE, Appellant in
No. 82–1414.

Nos. 82–1399, 82–1410 to 1414.

United States Court of Appeals,
Third Circuit.

Argued March 16, 1983.

Decided May 20, 1983.

As Amended June 13, 1983.

Rehearing Denied June 16, 1983.

Certiorari Denied Oct. 3, 1983.
See 104 S.Ct. 157.

Peter F. Vaira, Jr., U.S. Atty., E.D. Pa., Joel M. Friedman, Albert J. Wicks, Sp. Attys., Dept. of Justice, Philadelphia, Pa., William C. Bryson (argued), Dept. of Justice, Washington, D.C., for appellee.

Carmen C. Nasuti (argued), Nasuti & Miller, Philadelphia, Pa., for Mario Riccobene.

Robert F. Simone (argued), Philadelphia, Pa., for Jos. Ciancaglini.

Oscar N. Gaskins, Gaskins & McCaskill, Philadelphia, Pa., for Chas. Warrington.

Bonnie B. Leadbetter (argued), Philadelphia, Pa., for Pasquale Spirito.

Alan B. Epstein (argued), Jablon, Epstein & Wolf, Philadelphia, Pa., for Jos. Bongiovanni.

Mario J. D'Alfonso, Camden, N.J., for Harry Riccobene.

* Honorable Harold A. Ackerman, United States District Court for the District of New Jersey, sitting by designation.

Before ADAMS and HUNTER, Circuit Judges and ACKERMAN, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The appellants in this case challenge their convictions under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), and the federal gambling statute, 18 U.S.C. § 1955. Their primary argument is that the evidence failed to show beyond a reasonable doubt either that they were engaged in the conduct of a single on-going enterprise, as required for the RICO count for which they were convicted, or that their activity constituted a single conspiracy. They also contend that the jury could not properly have found that each appellant committed the acts charged against him as predicate offenses of the RICO count. In addition, various appellants raise the following claims individually: that the evidence as to particular counts was insufficient; that the district court committed reversible trial errors; that certain confidential attorney-client communications were intercepted by the F.B.I. wiretaps; and that RICO violates both the fifth and eighth amendment rights of the appellants by permitting the imposition of unjustifiably harsh sentences. After considering all of the contentions raised by each defendant, we conclude that the evidence was sufficient in all respects and that no reversible errors were committed by the district court. Accordingly, the convictions will be affirmed.

### .I.

This RICO case involves a number of persons who were members of an alleged "crime family" in Philadelphia. The government asserts that during the period covered by the indictment, 1972 to 1978, there existed an on-going criminal enterprise, implicating each of the defendants, and that this enterprise engaged in activities that included illegal gambling, mail fraud, wire fraud, extortionate credit trans-

actions and collection of unlawful debts. At trial, the bulk of the evidence consisted of tape recordings of conversations among the co-conspirators that were intercepted by government wiretaps at three locations: Frank's Cabana Steak House, the Tyrone DeNittis Talent Agency; and the C. Warren Check Cashing Company. The transcripts of these tapes fill eight volumes.

## A. The Participants in the Enterprise

Angelo Bruno, a named co-conspirator, headed the enterprise; the "underboss" was co-defendant Philip Testa. Supervisors in the enterprise, who worked under Testa, included appellant Harry Riccobene, co-defendants Frank Narducci and Carl Ippolito, and co-conspirators Nicodemo Scarfo, John Simone and Frank Sindone. Appellant Joseph Ciancaglini was, to a lesser extent, part of the core group of the organization. He appears to have worked for Sindone, the most active of the supervisors, to oversee many of the gambling operations of the enterprise.

The other appellants were not major figures in the overall operation of the organization. Mario Riccobene was a partner of his half-brother Harry in the loan-sharking and numbers businesses that they operated out of the DeNittis Talent Agency in South Philadelphia; Mario also appears to have served occasionally as Bruno's driver. Joseph Bongiovanni worked for the Riccobenes.

Charles Warrington and Pasquale Spirito, the final two appellants, had virtually no direct contact with the Riccobenes and Bongiovanni. Warrington ran various gambling operations, both numbers and craps games, at which Spirito worked.[1] These operations were supervised by Ciancaglini, who also oversaw the Riccobenes' numbers game.

By the time the trial took place, a number of the co-conspirators and defendants had been killed, including Bruno, Testa, Narducci, Sindone and Simone; Ippolito was declared incompetent to stand trial; and Scarfo is in federal custody on unrelated charges.[2]

## B. The Activities

The indictment charges that the "pattern of racketeering activity" in this case is demonstrated by eight predicate offenses committed by various appellants. Some of these activities implicate just one appellant, acting with other co-conspirators. There is no single predicate offense in which all the appellants participated together.[3]

### 1. Chestnut Hill Lincoln Mercury Dealership

Three of the predicate offenses charged against appellant Ciancaglini arose from activities connected with the Chestnut Hill Lincoln Mercury car dealership. Harry Brown, the general manager of the dealer-

1. Pasquale Spirito was killed during the pendency of this appeal. Accordingly, the judgment in 82–1412 will be vacated and that case remanded to the district court with directions to dismiss the indictment. See *United States v. Pauline*, 625 F.2d 684, 685 (5th Cir.1980); *United States v. Littlefield*, 594 F.2d 682 (8th Cir. 1979); *United States v. Bechtel*, 547 F.2d 1379 (9th Cir.1977).

2. A final defendant, Frank Primerano, was acquitted by the court at the close of evidence.

3. The predicate offenses charged against each appellant were as follows:

Ciancaglini—extortionate credit transactions, mail fraud, collection of unlawful debt, and operation of three separate illegal gambling activities (Reed Street craps game, 1976 numbers operation, 1977 numbers operation).

Harry Riccobene—extortionate credit transaction, collection of unlawful debt, and operation of illegal gambling business (1977 numbers operation).

Mario Riccobene—extortionate credit transaction and operation of illegal gambling business (1977 numbers operation). Mario was originally charged with collection of unlawful debt as an additional predicate offense, but that charge was dismissed at the conclusion of the government's case at trial.

Warrington—wire fraud, and three separate gambling operations (Reed Street craps game, Andalusia craps game, and 1978 numbers operation).

Bongiovanni—collection of unlawful debt and operation of illegal gambling business (1977 numbers operation).

ship, testified that since 1969 he had borrowed money from Frank Sindone at a rate of 2½% interest per week. After a time, Brown, with the permission of Testa and Sindone, lent money to Russell Wilmerton at unlawfully high interest rates. When Wilmerton could not repay the loan, Brown, Ciancaglini and another man went to his house twice. Ciancaglini remained silent as the other men threatened Wilmerton. Ciancaglini later told Harry Riccobene that he had gone to Wilmerton's house to help collect the debt. The collection of the Wilmerton debt is the basis for the racketeering acts of extortionate credit and unlawful debt collection charged against Ciancaglini.

Ciancaglini attended a meeting with Brown, Testa, Sindone and Brown's employer to discuss methods of generating cash so that Brown could repay some of his loans to Testa and Sindone. Brown proposed the staging of a robbery at the car dealership. Sindone and Testa agreed, and as part of the scheme, arranged that Ciancaglini be given a car free of charge. The records of the business were altered to show that Ciancaglini paid $3,000 in cash for the car on the day of the robbery, although he had in fact paid nothing. The dealership reported the robbery to the police and to its insurance carrier, claiming the $3,000 supposedly paid by Ciancaglini as part of the loss; the carrier paid the claim. When questioned by the police, Ciancaglini falsely stated that he had paid that amount of cash for the automobile, and that he knew nothing of the robbery. This scheme is the basis for the mail fraud claim against Ciancaglini as a predicate offense to the RICO conspiracy.[4]

### 2. The Numbers Operations

In 1976, Ciancaglini, Sindone and Testa managed an illegal numbers operation which they discussed in several intercepted conversations. Ciancaglini also had conversations, which were recorded, with persons working for him concerning this operation. He discussed the accounts with Sindone and Testa and described his own role as collecting the money from the game. He referred to Sindone as his "boss." This operation formed the basis for one of the predicate offenses charged against Ciancaglini.

Between September and November 1977, Harry and Mario Riccobene conducted a numbers operation. At trial, a government expert testified that, in his estimation, more than 35 persons ran numbers for the Riccobenes; one was Joseph Bongiovanni, who discussed the numbers operation with Harry Riccobene several times. Ciancaglini was overseeing this business and coordinating the numbers games for the enterprise. He apparently visited the Riccobenes at their offices every Wednesday, and after one such visit he was seen handling a large sum of cash to Angelo Bruno. According to the government's theory of the case, the Wednesday visits were for the purpose of collecting a share of the week's numbers profits. At one of these meetings, Ciancaglini and Harry Riccobene discussed the "cut numbers" problem and the need for a uniform policy.[5] Ciancaglini promised that he would discuss the matter with Sindone, who might then have to go to Bruno to have it resolved. This numbers operation was one of the predicate offenses charged against the Riccobenes, Ciancaglini and Bongiovanni. It was also the basis for the substantive crime of illegal gambling charged against these four in Count III of the indictment.

There was evidence that Warrington conducted an illegal numbers operation between April and June 1978. Warrington apparently reported to Ciancaglini and Sindone, and the tapes indicate that on at least one occasion Warrington met with Ciancaglini to straighten out a problem with one

4. Harry Brown has previously been convicted for his participation in these activities. *See U.S. v. Brown*, 583 F.2d 659 (3d Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979).

5. The government's brief states that " 'cut numbers' are numbers that are played more often than other numbers, and on which the payoff to the bettor is 'cut' to a level lower than the usual 600 to 1 payoff." *Govt.Br.* at 25 n. 22.

of the numbers runners and to "unload" a "two weeks ribbon."[6] This operation formed the basis of one predicate offense for Ciancaglini and Warrington.

### 3. *Riccobenes' Loan Business*

The wire-tap transcripts contain several conversations between Harry Riccobene and others concerning the loansharking business that Harry Riccobene conducted out of the DeNittis Talent Agency. Bongiovanni proposed various loans and Harry Riccobene set the terms. The usual interest rates for these loans was 5% per week. In one conversation, the two men discussed a customer named Abbotts who had borrowed $1,000, paid back $800 and still owed $400. Bongiovanni then added that Abbotts was to pay $100 per week on his loan, which amounts to an interest rate of 20% every ten weeks, significantly higher than the current prime rate. This and other similar transactions formed the basis for the predicate offense of "collection of unlawful debt" that was charged against Harry Riccobene and Bongiovanni.[7]

Intercepted conversations between Mario and Harry Riccobene indicated that these two men threatened their debtors with physical harm if loans were not repaid promptly. On October 17, 1977, the brothers discussed a loan they had made to someone named "Richie," who had not been making his payments. Mario said "I caught that Richie. I almost hit Richie across the f____ head, that's why he's starting to pay. I caught him in the john over there.... I put him in the corner. And I told him if you don't bring $100 a week, the next time I see you, there's no excuse. I'm gonna leave you on the street." These activities of Harry and Mario Riccobene in the

fall of 1977 formed the basis for the predicate offense charged against them of collection of credit through extortionate means.

### 4. *Reed Street Craps Game*

In April, 1976, FBI agents conducted a court-authorized search of 735 Reed Street in Philadelphia. A craps game was apparently being conducted, and 45 people were present. There was gambling paraphernalia and $15,000 cash on the floor. Appellant Warrington was present. In various recorded conversations after this raid, both men indicated that they operated the game along with others. This was not a one-night game, but rather an on-going operation that was not reopened after the raid. An FBI expert testified at trial that, based on a conversation among Testa, Narducci, Ippolito and Sindone, it was his opinion that those four men and Warrington were the people who had a financial interest in the game. The expert also testified that in an average 6-hour game night, approximately $522,000 would be wagered, generating a profit of between $18,000 and $25,000.

The government contends that Ciancaglini served as the intermediary between Warrington, Narducci, Ippolito and Grande on the one side and Testa and Sindone on the other. Taped conversations indicate that Ciancaglini supervised at least one craps game, but nothing in the portions of the tapes cited by the government in its brief in this Court specifically mentioned the Reed Street game. The Reed Street game was the basis of one predicate offense charged against Warrington and Ciancaglini and it was also charged as a substantive violation of the federal gambling law, 18 U.S.C. § 1955, in Count II of the indictment.

---

**6.** A ribbon is a record of wagering activities in a numbers operation.

**7.** For purposes of RICO, an "unlawful debt" is defined as a debt:
(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws re-

lating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate:

18 U.S.C. § 1961(6).

### 5. The Andalusia Craps Game

According to the government's expert, Warrington and Ippolito had a financial interest in, and conducted, a craps game in Andalusia, Pennsylvania, which operated in the afternoons and early evenings from 1976 to 1978. The game ran for alternating 5-week periods with a game in Bristol, Pennsylvania run by "guys from Trenton." The Bristol game was raided by the FBI on June 3, 1978. In subsequent conversations, Warrington made clear that he nonetheless intended to reopen the Andalusia Game, stating "They're [the FBI] not gonna stop my f——— living." The operation of this game formed the basis for one of the predicate offenses charged against Warrington.

### 6. The Craps Game Scam

Warrington and Sindone and three other men set up a phony craps game in New Jersey to cheat a player out of a substantial sum of money. The scam was successful and the man lost $4500. Warrington, in arranging the scam, stated in an intercepted conversation that Bruno had approved the scam and would intervene if the New York group demanded a share of the profits. This is a reference to an arrangement between the Philadelphia and New York organizations that all New Jersey gambling would be split "50–50." Since the scam was a false, rather than a real operation, Warrington believed that New York was not entitled to its "cut."

In the course of setting up the scam, Warrington placed two recorded phone calls from his office in Pennsylvania to the victim in New Jersey. This wire fraud was one of the predicate offenses charged against Warrington.

### C. Procedural History

The defendants were indicted by a federal grand jury on February 19, 1981. Count I of the indictment set forth the RICO conspiracy, in which all the defendants were charged. It alleged eight predicate offenses and forty-one overt acts committed in furtherance of the RICO conspiracy. Count II charged Ciancaglini and Warrington with violating the federal gambling statute, 18 U.S.C. § 1955, by conducting the Reed Street craps game. Count III charged Ciancaglini, the Riccobenes and Bongiovanni with violating the federal gambling laws by conducting their 1977 numbers operation.

Trial was before a jury, and lasted approximately one month, from April 13 to May 10, 1982. The government's case consisted of lay and expert witnesses and tapes of intercepted conversations among the co-conspirators. Appellants did not put on a defense. They were all convicted on Count I. Warrington was convicted on Count II, but Ciancaglini was acquitted of this charge. On Count III, Ciancaglini, the Riccobenes and Bongiovanni were all found guilty. After sentencing, each appellant filed a timely notice of appeal.

### II.

■ The Racketeer Influenced and Corrupt Organizations Act was enacted "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Pub.L. No. 91–452, 84 Stat. 922, 923 (1970). See Blakey, "The RICO Civil Fraud Action in Context," 58 N.D.L.Rev. 237, 249–80 (1982) (examining the legislative history of the statute in considerable detail). RICO makes it a federal crime for individuals "employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) provides that it is unlawful to conspire to violate Section 1962(c).[8] To establish an "enterprise" conspiracy, the govern-

---

**8.** Section 1962(d) also prohibits conspiracies to violate the other substantive criminal provi-sions of RICO. Sections 1962(a) and (b).

ment must prove beyond a reasonable doubt that an "enterprise" did in fact exist, and that the individual defendants knowingly agreed to participate in the "enterprise" through a pattern of racketeering. The appellants in the present case were convicted of violating Section 1962(d) by conspiring to violate Section 1962(c). They argue that the government failed to satisfy its burden of proving such an enterprise conspiracy and that their convictions on Count I must, therefore, be overturned. We conclude that, contrary to the appellants' assertions, the evidence was sufficient to demonstrate that an organization existed which satisfies the requirements for an "enterprise," and that all the members of the conspiracy knowingly agreed to participate in or conduct that enterprise through a pattern of racketeering.

### A. Existence of an Enterprise

"Enterprise," according to the statute, "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has recently held that a completely illegal organization may be an enterprise for RICO purposes. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see also United States v. Provenzano,* 620 F.2d 985, 992–93 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). The *Turkette* Court recognized that RICO's primary purpose is to "address the infiltration of legitimate business by organized crime." 452 U.S. at 591, 101 S.Ct. at 2532, but determined that it was not inconsistent with this purpose to read the plain language of the statute to punish the activities of illegal organizations even before that infiltration occurred. This "preventive" function enables federal law enforcement officials "to deal with the

problem at its very source." 452 U.S. at 591, 101 S.Ct. at 2532, 2533.

In reaching its conclusion, the Supreme Court was not unmindful of the dangers of its interpretation. 452 U.S. at 582–83, 101 S.Ct. at 2528–29. Both judges and commentators had raised the concern that the concept of "illegal enterprise" could be construed quite broadly. Legal scholars had concluded that, without further refinement of the term, the statute could be extended to situations far removed from those actually contemplated by Congress, and that federal prosecutors could use the law to invoke an additional penalty whenever they had a case involving the commission of two offenses that, coincidentally, were among those listed as "racketeering activities." *See United States v. Anderson,* 626 F.2d 1358 (8th Cir.1980), *cert. denied* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981); *United States v. Sutton,* 605 F.2d 260 (6th Cir.1979) *rev'd en banc,* 642 F.2d 1001 (6th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981); Bradley, *Racketeers, Congress, and the Courts: An Analysis of RICO,* 65 Iowa L.Rev. 837 (1980); Tarlow, *RICO: The New Darling of the Prosecutor's Nursery,* 49 Fordham L.Rev. 165 (1980).

To avoid these dangers, the *Turkette* Court provided a definition of "illegal enterprise" for RICO purposes. It set forth the elements necessary to establish the existence of such an enterprise: "evidence of an ongoing organization, formal or informal" and "evidence that the various associates function as a continuing unit." 452 U.S. at 583, 101 S.Ct. at 2528. In addition, the enterprise must be shown to have an existence "separate and apart from the pattern of activity in which it engages." 452 U.S. at 583, 101 S.Ct. at 2528.[9] The Court stated that "the proof used to establish

---

**9.** The Second Circuit has recently held that certain illegal organizations, although satisfying the *Turkette* requirements for "enterprise," are not within the ambit of the RICO statute. In *United States v. Ivic,* 700 F.2d 51 (2d Cir. 1983), Judge Friendly concluded that the members of a Croatian nationalist terrorist organi-

zation could not be prosecuted under RICO for their participation in that organization since Congress had enacted the statute to prohibit economically motivated activity. Since neither the enterprise nor the predicate offenses have a "financial purpose," the RICO statute was inapplicable to their activities.

these separate elements may in particular cases coalesce." 452 U.S. at 583, 101 S.Ct. at 2528.

Because the issues of ongoing organization, continuing membership and separate existence are questions of fact, they must be resolved in the first instance by the jury. The scope of our review of factual determinations is, of course, quite limited. We must sustain the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) (citations omitted). We turn now to the facts of the case at hand to consider whether, under the *Glasser* standard, the evidence is sufficient to sustain the jury's finding that an enterprise did exist.

Each of the elements enumerated by the Supreme Court describes a separate aspect of the life of the enterprise. The "ongoing organization" requirement relates to the superstructure or framework of the group.

To satisfy this element, the government must show that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis. This does not mean that every decision must be made by the same person, or that authority may not be delegated.

In the situation before us, there is substantial evidence showing that such a framework did exist. The organization here was a hierarchy presided over by Bruno, with an inner group of advisors and supervisors, and an undisclosed number of lower level associates operating the illegal businesses. Several intercepted conversations illustrate this structure. On November 4, 1977, four of the co-conspirators, Testa, Narducci, Scarfo, and Harry Riccobene, discussed the selection of a new "consigliere," or advisor, for the group.[10] From

---

10. The participants in the conversation are designated by their initials: H-Harry Riccobene; PT-Phil Testa; FN-Frank Narducci; NS-Nicky Scarfo. Phrases transcribed phonetically are marked "(PH)."

PT: So what's gonna happen, HARRY? Did you hear anything about the new "Cosig" ... (PH)?
H: The new what?
PT: The new "Cosig"! The new Consiglieri! (TESTA utters Italian expression ...) ... "Menda se vis" ... (PH).

\* \* \* \* \* \*

FN: He ... never says nothing to us. I'm "Capi" and don't know. I presume he don't know either.
H: It shouldn't be. . . .
PT: I know what the law is HARRY.
H: It shouldn't be.
NS: The right way should be the right way.
PT: Yeah.
H: Yeah. If you don't want to get.
PT: Everything is changed! I don't know, everybody does what the F ... (obscene) ... they want anymore!
H: No. Nothing changed.
PT: Well.
H: Well, if you don't get "everybody" ... You get all of the "heads" ... You know? That's acceptable. And let them vote on it.
PT: Yeah, you know why it's acceptable? Because the Capi's are supposed to talk to their men.

\* \* \* \* \* \*

PT: But in your time HARRY, has there ever been more than two candidates? More than one candidate?
H: Never.
PT: Usually they chose a guy and that's the end of it.
NS: And that's the end of it. It usually works out that way.
H: We'd have a "thing" you know. And I would say, ah ... "I propose NICKY." And you would go, "I second the motion."
FN: All right.
H: Anybody against it?
NS: And that's the end of it.
H: You see, it isn't like it used to be, where everybody was invited. Today, it's not gonna be that way. They are only gonna invite certain people. And the certain people are gonna be the ones that are gonna give him the vote.
PT: Right.
H: You follow me?
NS: Uh huh.
H: If it could be like the old days, then you could go around him a little a be ah ... you know, use the power. You talk to all your potential close associates. Then you get the names, nominate somebody. You propose him. I propose this guy. And somebody seconds the motion. And then there is a vote between them. If nobody goes against the guy that is selected, it's all over.
FN: Over here, he's not even bounded by the cigars PH. He just proposes "A" PH and that's it. Whatever he says.

their conversation, it is apparent that there are regularized roles in the organization, and that the various positions provide their holders with different rights and privileges, such as voting in these elections.

Another example of the structure of the group is provided by two conversations between Ciancaglini and Harry Riccobene concerning the numbers operation. Riccobene complained about the "cut numbers" problem,[11] and the need for a uniform policy among the operators of numbers games. Ciancaglini promised to take the problem to Sindone, who apparently supervised the games. On his return visit, Ciancaglini reported that he had explained the situation to Sindone, but because of the nature of the matter, Sindone might have to take it to Bruno to be resolved. As with the November 4th conversation, these discussions demonstrate the different roles and responsibilities at various levels of the organization. The evidence is sufficient, therefore, to show an organization with a leader and a group of supervisors, each running his own operations with "his own people," but coordinated with the operations of other supervisors to provide greater profits and fewer conflicts.

The second necessary element for an enterprise under RICO is that "the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. This does not mean that individuals cannot leave the group or that new members cannot join at a later time. It does require, however, that each person perform a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization. The evidence presented at trial is adequate to establish that the appellants did occupy continuing positions within the group.[12]

> H: That's right, that's what it is!
> NS: Right.
> FN: Get the ones that are gonna go that way and that's it.

11. *See* note 5 *supra* & accompanying text.

Harry Riccobene, in addition to his position as a member of the core group, conducted two individual illegal businesses under the supervision and protection of the organization—a numbers game and a loan-sharking operation. The evidence also demonstrates that his brother Mario was his partner and that Bongiovanni worked for them. This conduct is consonant with the structure shown under the first element, and the activities of these three in operating the illegal businesses further the enterprise. Harry Riccobene claims to be lending out "their money," a veiled reference to members of the core group, in the loan business, and the numbers game conducted by the Riccobenes, with Bongiovanni's assistance, appears to be one of a series of games coordinated by the core group.[13]

Ciancaglini's role, as indicated by the evidence, was to act as an intermediary between at least one member of the core group, Frank Sindone, and the operations which Sindone oversaw. He also served as a coordinator and money collector for the enterprise's numbers operations. One of the games Ciancaglini supervised was conducted by Warrington. Warrington also conducted two craps games, one at Reed Street and one in Andalusia, which, according to intercepted conversations and expert testimony, were invested in and monitored by the core group. As this brief summary indicates, the actions of Ciancaglini and Warrington are consistent with the organizational structure of the group and serve to benefit the enterprise.

The third and final element in establishing the enterprise is that the organization must be "an entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. As we understand this last requirement, it is not necessary to show that the enterprise has some function wholly unrelated to the

12. The question whether each appellant knowingly participated in the enterprise is a separate issue, going to individual criminal liability for the conspiracy. This issue will be discussed at pp. 226–230, *infra.*

13. *See* p. 219 *supra.*

racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.[14] As our discussion of the organization in this case has already shown, there is sufficient evidence to find that the enterprise served a clearinghouse and coordination function above and beyond that necessary to carry out any single one of the racketeering activities charged against the individual defendants.

The evidence adduced is adequate to show the existence of each of the three elements identified by the Supreme Court as necessary to establish an enterprise.

### B. Agreement to Participate

■ Establishing that an enterprise exists, however, does not end the inquiry in a RICO conspiracy case. In addition, the government must show agreement: that each participant knowingly associated himself with the larger enterprise. Some of the appellants contend that the evidence does not establish a single conspiracy, but that at best it demonstrates a series of unrelated agreements, each occurring in connection with one or more of the predicate offenses. Therefore, they argue that there was a variance between the offense charged in the indictment and the proof offered at trial which prejudiced substantial rights of the defendants. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Camiel, 689 F.2d 31 (1982). Viewing the evidence in a light most favorable to the government, we conclude that there was no variance from the indictment and that there was sufficient evidence from which the jury could have found that each of the

appellants agreed to participate in a single enterprise conspiracy.

The issue of what constitutes a conspiracy under RICO is a matter of first impression in this Circuit but has been actively debated in the Fifth and other Circuits. See United States v. Brooklier, 685 F.2d 1208 (9th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); United States v. Lemm, 680 F.2d 1193 (8th Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 789, 74 L.Ed.2d 960 (1983); United States v. Sutherland, 656 F.2d 1181 (5th Cir.1981), cert. denied, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); United States v. Lee Stoller Enterprises, Inc., 652 F.2d 1313 (7th Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981); United States v. Elliott, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); see also Blakey and Goldstock, 'On the Waterfront': RICO and Labor Racketeering, 17 Am.Crim.L.Rev. 341, 360–62 (1980). The Fifth Circuit has determined that in enacting section 1962(d) Congress did not radically alter traditional conspiracy doctrine except to the extent that it proposed a dramatically new conspiratorial objective. An agreement merely to commit the predicate offenses would not be sufficient to support a RICO conspiracy. Nor is it sufficient if the defendants merely participate in the same enterprise. See Sutherland, supra, 656 F.2d at 1192 (explaining Elliott). This is so because, under RICO, it is an agreement "to conduct or participate ... in the conduct of [an] enterprise's activities" through the commission of predicate offenses that is prohibited, not an agreement to commit a pattern of racketeering activity alone. As stated in Blakey and Goldstock, supra at 361: "[T]he key element is proof that the various crimes were performed in order to assist the enterprise's involvement in corrupt endeavors." Consequently, we agree with the Fifth Circuit that Congress intended that "a series

---

**14.** This was in fact the situation presented in Turkette. The Supreme Court affirmed the respondent's RICO conviction, which had been based on his "leadership of this criminal organization through which he orchestrated and participated in the commission of the various crimes delineated in the RICO count or charged in the eight preceding counts." Turkette, 452 U.S. at 579, 101 S.Ct. at 2527.

of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single 'enterprise' conspiracy" if the defendants have agreed to commit a substantive RICO offense. *Sutherland, supra,* 656 F.2d at 1192.

■ Proof of agreement in a RICO proceeding may be established by circumstantial evidence to the same extent permitted in traditional conspiracy cases. It is well-established that one conspirator need not know the identities of all his co-conspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it. *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir.1982); *United States v. Boyd,* 595 F.2d 120 (3d Cir.1978). Our review of the record convinces us that, viewing the evidence in the light most favorable to the government, there was sufficient evidence from which the jury could have found that each of the appellants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses. Having established that a jury could properly have concluded that a single enterprise existed which supervised and coordinated a series of criminal activities, such as gambling and loan-sharking, it is not difficult for us to reach the conclusion that the jury could have found that each appellant must necessarily have known that the individual operations were supervised or financed, at least in part, through the organizational infrastructure by members of the core group.

There can be no doubt that Harry Riccobene was fully aware of the extent of the enterprise with which he was associated. He was a member of the core group, and his statements in intercepted conversations make clear that he had been an active member for at least 40 years. For example, in a conversation with Bongiovanni, he talked about his participation in a 1931 "war" be-

tween various factions of the Cosa Nostra. Riccobene then went on to explain why he chose not to become "the boss," and why Bruno was still in power, even though "he don't have the capability."

Evidence of Bongiovanni's knowledge of the scope of the enterprise comes primarily from his discussions with Harry Riccobene. Although Bongiovanni contends that these conversations concerning the group's past indicate merely that he was an amateur historian, the jury could have concluded he was aware of the present implications of that history. In discussing Bruno, for example, both Riccobene and Bongiovanni switch from past to present tense, and then they speak of the proper degree of respect that should be shown to "somebody . . . in that position." In addition, Riccobene told Bongiovanni at another time that "It's their money I lend out. It ain't my money." In other conversations, both men referred to "those guys from Tenth Street." [15] It also appears that Bongiovanni had some contact with Sindone. After the FBI raid at the talent agency, Sindone told Harry Riccobene that Bongiovanni had told him that the agents had mentioned Sindone's name during the raid. It is consistent with the structure of the enterprise that Bongiovanni would have had a relationship with Sindone. Sindone, through Ciancaglini, appears to have supervised the local numbers games, including the Riccobene operation at which Bongiovanni was employed. From all this, the jury could have concluded that Bongiovanni joined the enterprise knowing that its activities extended far beyond the particular gambling and loansharking operations at which he was employed, even though he might not have been aware of all of the organization's criminal acts or other participants.

Direct evidence demonstrating Mario Riccobene's knowledge of the scope of the conspiracy is more limited. Mario and Harry Riccobene were clearly partners in the illegal numbers and loansharking businesses.

---

15. The core group met regularly at Frank's Cabana Steaks on Tenth Street in Philadelphia and is referred to throughout the tapes as "Tenth Street" or "the guys from Tenth Street."

They apparently shared the same offices, which were visited with some regularity by higher-ranking members of the enterprise. Mario Riccobene obviously knew these men, serving on occasion as Bruno's driver when Bruno visited other members of the enterprise. He was at Bruno's home at the time of a meeting between co-conspirators Bruno, Testa, Simone and Sindone. Also, after the FBI raided the talent agency, Mario and Harry Riccobene discussed how the federal agents had found out about their operations. Mario stated that "it's just gotta be phone conversations or eavesdropping . . . . *Can't be 10th Street.*" (emphasis added). A reasonable inference from this last statement is that Mario Riccobene knew of the connection between his own operation and the core group who met at Frank's Cabana Steaks. From all of the evidence presented, including the close personal and business relationship between Mario Riccobene and his half-brother Harry, one of the central figures in the enterprise, the jury could have found that Mario knowingly agreed to participate in the enterprise.

There was overwhelming evidence to show that Ciancaglini was aware of the scope of the enterprise. In addition to other activities, he supervised the numbers operations for Sindone, and served as money collector for the numbers game conducted by members of the core group.

There is sufficient evidence from which the jury could have found that Warrington knowingly participated in the enterprise as well. During the craps game scam, he indicated his knowledge of the profit-sharing arrangement between Philadelphia and New York, and that Bruno had told him that, since it was a scam, the 50% rule did not apply. In addition, Warrington was concerned that Simone, a member of the core group, would want a share of the profits and that, in order to avoid trouble, Sindone would order Warrington to give Simone a cut. Sindone was one of the members of the core group who shared with Warrington a financial interest in the Reed Street craps game which Warrington operated. Warrington's demonstrated knowledge of the core group and his statements

as to their supervision of his activities provided the jury with sufficient evidence from which to conclude that he was aware of the scope of the conspiracy with which he was associated.

 Our review of the evidence has shown that a single enterprise did exist and that each appellant was a knowing member of the conspiracy "to conduct or participate . . . in the conduct of such enterprise's affairs. . . ." 18 U.S.C. § 1962(c). Appellants put forth two subsidiary arguments under their "multiple conspiracy" claims which we must address before we turn to their remaining contentions. First, at least some of them argue that there was insufficient independent evidence of their participation in the conspiracy to justify the admission of hearsay statements under Federal Rule of Evidence 801(d)(2)(E) by alleged co-conspirators as evidence against them. As the review of the evidence against the appellants has demonstrated, however, it was their own statements that were usually the most incriminating, and certainly provided sufficient evidence of the likelihood of a single conspiracy to justify the admission of their co-conspirators' statements. Second, each asserts that he was prejudiced by the introduction of masses of evidence of predicate offenses and overt acts which were in no way related to him. Inasmuch as we have held that a single conspiracy has been shown to have existed, there is no unfair prejudice here because all of the evidence went to proving some part of the conspiracy in which each of them participated.

### III.

In order to obtain a conviction under RICO, the government must show not only that a defendant participated in the operation of a single enterprise, but also that he did so "through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A pattern is established by proof that the defendant committed two or more predicate offenses—specified illegal acts, prohibited by either state or federal

law—which are often associated with organized crime.[16] In the present case four of the appellants were charged with committing more than the minimum number of two predicate offenses.[17] Three of the appellants, Harry Riccobene, Warrington and Ciancaglini, argue that the jury could not properly have found them to have committed *all* of the predicate offenses with which they were charged, and that their RICO convictions must therefore be reversed.

Under *United States v. Brown,* 583 F.2d 659 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979), if a defendant is charged with multiple predicate offenses, the evidence must be sufficient to prove all of them if the court cannot determine which specific offenses the jury relied upon in reaching its verdict. *See also United States v. Tarnopol,* 561 F.2d 466 (3d Cir.1977); *United States v. Dansker,* 537 F.2d 40 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748

(1979). In *Brown,* the jury was presented with four acts set forth as predicate offenses in a RICO conspiracy; each act also formed the basis for a separate substantive offense charged against the defendant.[18] The jury convicted on all counts. On appeal, this Court overturned the convictions on two of the substantive counts, finding that the conduct charged in those counts did not, as a matter of law, constitute mail fraud. Then, because the Court had no way of ascertaining which of the substantive offenses the jury had relied upon to satisfy the requirement of two predicate racketeering acts for the RICO conspiracy, it overturned the conviction on that count as well, despite the fact that two of the potential predicate offenses still constituted valid bases for the verdict.

The government has argued that, regardless of the merits of their claims, the appellants here have waived their right to object on the *Brown* issue. At trial, the govern-

---

16. "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year: (B) any act which is indictable under any of the following provisions of title 18 United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of state or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to inter state transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic),

(C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States; 18 U.S.C. § 1961(1).

17. The indictment also charged that Mario Riccobene had committed two racketeering acts and collected an unlawful debt. The unlawful debt charge was dismissed at the conclusion of the government's case. Joseph Bongiovanni was alleged to have committed one racketeering act and to have collected unlawful debt. Because two racketeering acts were not alleged, the jury was instructed that it could convict him of the RICO violation only on the basis of the unlawful debt. *Transcript of charge of the Court* at 114.

18. The defendant in *Brown* was one of the witnesses in the case now before us. Harry Brown, the general manager of Chestnut Hill Lincoln Mercury, was convicted for his part in the extortion of Russell Wilmerton and the scheme to defraud the dealership's insurance carrier by staging a fake robbery. These activities are also the basis for several of the predicate offenses charged against Ciancaglini.

ment requested that the court submit special interrogatories to the jury if it returned a verdict of guilty. The interrogatories were designed to establish which of the predicate offenses the jury had relied on to convict the defendants of the RICO offense. Because the defendants objected, the district court did not submit the interrogatories after the general verdict was returned. The government analogizes the objection to "invited error," a doctrine which prohibits a defendant from seeking appellate review of "alleged errors invited or induced by himself," *U.S. v. Lewis,* 524 F.2d 991, 992 (5th Cir.1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1673, 48 L.Ed.2d 180 (1976). If the defendants had allowed the special interrogatories, then there would have been no *Brown* problem presented on appeal.

This argument by the government would appear to overlook one critical element. The government does not contend that the district court erred in refusing the request for interrogatories. It is within the discretion of the district court to permit special interrogatories and even where the opposing party does not object, the court is not required to submit special questions to the jury. Since the government does not argue that it was an abuse of discretion for the district court to refuse the government's request, we will not impose upon the defendants the harsh penalty of waiver merely for requesting that the district court exercise its discretion in a manner contrary to the government's preferences.[19]

*Brown* does not require that we reverse the convictions of any defendant when there is sufficient evidence from which the jury could have concluded that he did commit every predicate offense charged against

him. Nor does it require reversal when the reviewing court can determine that the jury did not rely on the challenged predicate offense when reaching its verdict on the RICO charge. With these limits on the *Brown* doctrine in mind, we turn to a consideration of the specific claims made by each appellant.

■ Harry Riccobene was charged with three predicate offenses: extortionate credit, unlawful debt and gambling (numbers operation). He discussed his involvement in each of these activities in conversations that were intercepted. Viewing these statements in the light most favorable to the government, the jury could have found him guilty beyond a reasonable doubt of the predicate offenses.

■ There were four predicate offenses charged against Warrington: wire fraud and three gambling charges arising from the Reed Street craps game, the Andalusia craps game and the 1978 numbers operation. The wire fraud is supported by a series of intercepted conversations and interstate telephone calls. As to the gambling offenses, there are intercepted conversations in which Warrington discusses his involvement in all of the games. He was at the Reed Street location when it was raided by the FBI, and an FBI expert testified that, from the intercepted conversations it appeared that Warrington, along with four co-conspirators, had an on-going financial interest in the game. As to the numbers operation, in addition to intercepting conversations, the FBI searched Warrington's home and his business, the C. Warren Check Cashing Agency. At the home they found several envelopes of cash and a notebook which a government expert testified con-

---

**19.** The district court, in refusing the request for interrogatories, recognized that the Third Circuit has repeatedly stated that the use of special interrogatories is disfavored in criminal cases. *But see* Note, "RICO and the Predicate Offenses," 58 N.D.L.Rev. 382, 407–08 (1982) (arguing that special verdicts should be used in RICO cases to determine which predicate offenses the jury found to comprise the pattern of racketeering activity). Even where this Court has approved the use of such questions, it has reiterated its concerns that special inter-

rogatories may unduly sway the jury in its decision regarding the defendant's guilt or innocence. *See United States v. Desmond,* 670 F.2d 414 (3d Cir.1982); *United States v. Palmeri,* 630 F.2d 192 (3d Cir.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981). We note, however, that in the present case the questions were to have been submitted *after* the verdict had been returned and the jury polled. Thus, the dangers usually involved in the use of jury interrogatories in a criminal case were not present here.

tained the records for the numbers business. From all this evidence, the jury could have found beyond a reasonable doubt that Warrington had committed all four of the predicate offenses with which he was charged.

 Ciancaglini was accused of the following predicate offenses: extortionate credit transactions; collection of unlawful debt; mail fraud; and illegal gambling charges arising both from the numbers operations and from supervising the Reed Street craps game. There are intercepted conversations involving mail fraud and numbers charges from which the jury could have concluded beyond a reasonable doubt that Ciancaglini had committed those offenses.

Both the extortionate credit and unlawful debt accusations arose from Ciancaglini's participation in the collection of the illegal loan made by Brown to Wilmerton. Although Ciancaglini never said anything when he accompanied Brown, he did admit in an intercepted conversation that he had been there to assist in the collection. He was present on one occasion when physical force was used. His later conversations with Harry Riccobene indicate that he knew that the debt was unlawful and that Brown was a loanshark. Thus, the evidence was sufficient as to these charges as well.

 Ciancaglini raises a separate challenge to the jury's possible finding that he was involved in the collection of an unlawful debt. He claims that the district court gave inconsistent instructions to the jury on the issue of collection of an unlawful debt. At one point during the charge, the court stated that the collection of an unlawful debt could not serve as a predicate offense if more than five years old and at another point told the jury it could consider the collection of the Wilmerton debt, which seems to have occurred more than five years earlier. Ciancaglini did not, however, object to the jury instructions or request that the court withdraw the Wilmerton loan charge from consideration by the jury because it was time-barred. He also did not raise the issue in his motion for judgment of acquittal. Consequently, he cannot now

raise this issue. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Caisson Corp. v. Ingersoll-Rand Co.,* 622 F.2d 672 (3d Cir.1980); *Newark Morning Ledger Co. v. United States,* 539 F.2d 929 (3d Cir.1976).

The final predicate offense charged against Ciancaglini was participation in the running of the Reed Street craps game. This accusation also formed the basis for the charge in Count II of the indictment—violation of the federal gambling statute (18 U.S.C. § 1955). Since the jury acquitted Ciancaglini on Count II, he now argues that the acquittal establishes that reliance on the Reed Street game as a predicate offense would have been improper. Because the jury returned only a general verdict of guilty on the RICO conspiracy charge, there is no way to determine if it did in fact bottom its verdict on the Reed Street activities. Accordingly, Ciancaglini asks that we reverse his RICO conviction on the basis of the *Brown* doctrine.

This case, however, differs from *Brown* in a very significant respect. In *Brown,* the jury had returned a verdict of guilty on both the RICO charge and the substantive crimes on which the RICO charge was based. When this Court reversed two of the substantive convictions, it had to strike down the RICO conviction as well, because the guilty verdicts on the substantive charges indicated that the jury might have relied on those charges as predicate offenses when considering the RICO claim.

By contrast, the jury in the present case *acquitted* Ciancaglini of the substantive crime of conducting an illegal gambling operation, which is prohibited by 18 U.S.C. § 1955. The predicate offense alleged in connection with the Reed Street game is that Ciancaglini "would and did" violate 18 U.S.C. § 1955. Thus, the verdict of acquittal on Count II serves a function analogous to that of a special interrogatory. Inasmuch as the jury stated affirmatively that it did not believe beyond a reasonable doubt that Ciancaglini had violated the federal gambling law, there is no reason for this Court to assume now that the jury returned

inconsistent verdicts by relying on that charge as a basis for the RICO verdict. For this reason, *Brown* does not require that the conspiracy conviction here be reversed.

## IV.

■ Several of the appellants raise additional challenges to the sufficiency of the evidence presented in connection with the various charges against them. Bongiovanni argues first that he never knew what the interest rates were on the loans he was collecting, and so did not know that the rates were in violation of the usury laws. The stark facts are, however, that Bongiovanni discussed with Harry Riccobene his collections on the Abbott loan, that Abbott had paid $800 on a $1000 debt, that he still owed $400, and that, according to Bongiovanni, Abbott was paying $100 weekly. Inasmuch as Bongiovanni was aware of these figures, the jury could properly have inferred that he knew the interest rate charged, regardless of whether he actually made the necessary calculations.

■ Bongiovanni's second challenge is to the sufficiency of the evidence as to Count III, which related to his participation in the 1977 numbers operation. The evidence shows that he was an employee of the game—taking bets from people—and thus he may be considered to have "conducted" a gambling business as is required by Section 1955. This Court has held explicitly that a "street runner" is covered by the Act. *United States v. Riehl,* 460 F.2d 454, 459 (3d Cir.1972).

Warrington argues that the evidence does not establish his participation in the Reed Street game, the offense for which he was convicted in Count II. The evidence is adequate to establish Warrington's participation in the Reed Street game.[20] *See* Part IB4, *supra.*

Ciancaglini contends that there was insufficient evidence linking him to the oper-

ation of the Riccobenes' numbers game, the offense for which he was convicted in Count III. He acknowledges that he conducted a numbers game at the same time the Riccobenes' game operated, but claims that the evidence does not show that it was in fact the Riccobenes' game that he supervised. Ciancaglini's discussions with Harry Riccobene concerning the "cut numbers" policy, along with the other statements present in the record, are sufficient to warrant a jury finding that it was the Riccobene game with which Ciancaglini was involved.

## V.

■ Appellants' next series of contentions involve the trial itself. They allege that the district court committed various errors warranting either the grant of a new trial or an acquittal. Appellants claim that the district court erred in permitting FBI Special Agent James Nelson to testify as an expert to define certain terms used on the tapes, such as "La Cosa Nostra," "capi," and "consigliere." Over the defendants' objections the testimony was admitted. The court limited the examination to a definition of the terms involved, and instructed the jury that the testimony was to be considered only for its definitional value. Our standard of review here is whether the district court abused its discretion by admitting the testimony for that limited purpose. These terms were not generally known, and there was considerable value in having the words explained to the jury. *See* Federal Rule of Evidence 702.

■ Nelson was particularly qualified to testify. He had participated in organized crime investigations for 12 years, had written various works on the subject, and had obtained information regarding this area from literature in the field, discussions with organized crime figures and transcripts of intercepted conversations. Moreover, one of the defense attorneys had stated earlier

---

20. Warrington "adopts" from the briefs of other appellants the argument that the jury instructions as to Count II were inadequate. Ciancaglini "adopts" a similar argument with respect to the charge in Count III. We are unable to locate a discussion of either issue in any brief. Absent any evidence of error, or allegation that the matters were properly raised before the district court, this Court cannot consider these claims.

in the trial that "any agent [would be able to] get up there and testify what the terms were." 6 Tr. 294. Consequently, we cannot say that it was an abuse of discretion to admit the testimony, especially in light of the limiting instruction given to the jury.

The second alleged trial error is raised only by Warrington. Warrington was represented in this case by Oscar Gaskins, Esquire. Gaskins worked with an associate, Ronald McGaskill, Esquire, and had assured the court that one or the other would be present at the trial. On the first day of trial, Warrington moved for a continuance on the ground that Gaskins had conflicting trial responsibilities that would require him to miss portions of the trial. The district court denied the motion, noting that all defendants and their counsel had known the trial date for two months, and that all the others had made arrangements to be available during this period. Also, Warrington's other attorney had the experience and capability to represent Warrington during Gaskins' absences. Gaskins was present during voir dire and opening statements, conducted some of the cross-examinations, and made the closing argument on his client's behalf. Warrington does not claim that McGaskill's representation was in any way inadequate. In light of all the circumstances, the denial of a continuance here was not an abuse of discretion. *See Morris v. Slappy,* —— U.S. ——, ——, 103 S.Ct. 1610, 1615, 75 L.Ed.2d 610 (1983); *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *Paullet v. Howard,* 634 F.2d 117, 119 (3d Cir.1980).

■ Bongiovanni adopts the argument that the district court erred in not granting him an acquittal on the ground that FBI wiretaps might have intercepted privileged attorney-client communications between Spirito and Spirito's lawyer during the course of the trial. Bongiovanni does not explain how the alleged violation of Spirito's rights affected him; he may believe

that general matters of trial strategy were overheard. The district court held a series of *ex parte* hearings with the government to determine the validity of the assertions that the attorney-client relationship had been invaded,[21] and ascertained that no violations of Spirito's sixth amendment rights had occurred. After reviewing the sealed transcripts of the *ex parte* proceedings, we conclude that the district court was correct; the attorney-client relationship was not violated. Accordingly, Bongiovanni's argument that he was collaterally harmed by any such violation is without merit.

## VI.

■ Appellants' final argument is that the RICO statute violates their fifth and eighth amendment rights by imposing unduly harsh penalties for their activities. Among the offenses which may be considered as racketeering acts under Section 1961 are certain state crimes.[22] To constitute a predicate offense for RICO purposes, these crimes must be punishable under state law by periods of imprisonment longer than one year. The predicate racketeering acts in the present case arising out of the numbers operations and the Andalusia craps games are state law violations, prohibited by 18 Pa.Cons.Stat. §§ 5512–13. Although they carry maximum penalties of five years, these crimes are classified as misdemeanors by the Commonwealth. 18 Pa. Cons.Stat. § 1104. Appellants urge that the imposition of the severe RICO penalties based on what they characterize as minor crimes is "cruel and unusual" and so fundamentally unfair as to violate their constitutional rights.

The argument is faulty in two major respects. First, we have previously explained the reason for the one-year limitation; it was "meant to limit RICO to serious offenses, offenses which in many but not all jurisdictions would be called felonies." *United States v. Davis,* 576 F.2d

---

21. The proceedings were conducted *ex parte* to avoid jeopardizing ongoing FBI investigations. Because the transcripts are sealed, we will not disclose the substance of any of the hearings.

22. 18 U.S.C. § 1961(1)(A). The text of this provision is set out at n. 16, *supra.*

1065, 1067 (3d Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). Thus, we need not be overly concerned with the labels a state chooses to attach to its crimes, so long as the violation falls within one of those categories of state offenses which Congress considered grave enough to form the basis for a federal crime.

Appellants' argument also misperceives the nature of a RICO violation. The predicate offenses referred to in the statute are not themselves the RICO violation, they are merely one element of the crime. The federal statute does not prohibit the commission of the individual racketeering acts. Rather, it bans the operation of an on-going enterprise by means of those acts. It was the enterprise that was seen by Congress to be the more serious and far-reaching problem. *See United States v. Forsythe,* 560 F.2d 1127, 1135 (3d Cir.1977). Congress therefore determined that more serious sanctions were needed to prevent that type of continuing conduct. In light of the Supreme Court's recent decisions in *Hutto v. Davis,* 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (U.S.1982) and *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), we cannot say that Congress exceeded its constitutional limits in setting the penalties for this crime, nor that the district court did so by imposing the sentences it did in this case.[23]

### VII.

None of the claims raised by the appellants has persuaded us that reversible error was committed. Accordingly, the judgment of the district court in Nos. 82–1399, 82–1410, 82–1411, 82–1413 and 82–1414 will be affirmed. The judgment in 82–1412, relating to Pasquale Spirito, now deceased, will be vacated and that matter will be remanded to the district court with instructions to dismiss the indictment.

---

**23.** The appellants received the following sentences on the RICO conviction:

Mario Riccobene—Five years imprisonment (suspended) and five years probation to run following completion of his term of imprisonment of Count III.

Joseph Ciancaglini—Ten years imprisonment and a fine of $10,000.

Charles Warrington—Ten years imprisonment and a fine of $10,000.

Joseph Bongiovanni—Seven years imprisonment (suspended) and five years probation to run following completion of his term of imprisonment for Count III.

Harry Riccobene—Nine years imprisonment and a fine of $15,000.