**HARRY MILLER CORPORATION**
Plaintiff,

v.

**MANCUSO CHEMICALS LIMITED**
Defendant.

No. 99–CV–2669.

United States District Court,
E.D. Pennsylvania.

Dec. 22, 2006.

Matthew Lee, Matthew D'Annunzo, Pepper Hamilton, for plaintiff.

Larry Wood, Paul Kennedy, Blank, Rome, Philadelphia, PA, for defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

I.   Introduction

Plaintiff Harry Miller Corp. ("Miller") brings against defendant Mancuso Chemi-

cals Limited ("Mancuso") an action for violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.*, among their claims. Defendant chose to file seven separate summary judgment motions. This memorandum will address the summary judgment motion relating to the RICO claims, Counts II and III of the Amended Complaint. The motion will be granted.

## II. Jurisdiction

Subject matter jurisdiction exists to consider plaintiff's RICO claims under 28 U.S.C. § 1331.

## III. Background [1]

Miller is a chemical company that produces a number of products, including a hydrochloric acid inhibitor known as Activol 1803 ("Activol"). A hydrochloric acid inhibitor removes "scale" that accrues on steel as the steel oxidizes, while simultaneously protecting the steel from further corrosion. The formula for Activol is Miller's trade secret.[2] In November 1990, Paul Carr, then an employee of Miller, incorporated his own chemical company, "Carr Chem." In December 1990, Carr left Miller's employ with Miller's formula for Activol 1803 in hand. Carr began selling a product identical to Activol 1803 under the trade name "Can–Hib." Carr sold Can–Hib to customers such as Dofasco, a large Canadian steel company. Dofasco had previously bought Activol from Miller and had ceased doing so around the same time that it began purchasing Can–Hib from Carr Chem.

In 1997, Miller sued Carr and Carr Chem for misappropriation of its trade secret. *Harry Miller Corporation v. Paul Carr and Carr Chem, Inc.* (under seal) ("the Carr Litigation"). The Carr Litigation settled in 1999 with Carr assigning to Miller all of its rights in Can–Hib. During the course of the Carr Litigation, Miller believed it had discovered for the first time that Carr had communicated the formula for Activol to Mancuso, the defendant in this litigation, and that Mancuso was, in fact, the true manufacturer of Can–Hib.

In 1999, Miller brought this action against Mancuso, alleging a number of state law claims and violation of the RICO statute, 18 U.S.C. § 1962(c)-(d). Miller's RICO claims arise out of Carr's and Mancuso's conduct during the Carr Litigation and supposedly after the settlement of that case. During the Carr Litigation, Carr and Mancuso denied that Can–Hib utilized the same formula as Activol. Instead, they contended that at a meeting on January 3, 1991, a man named Gary Young, now deceased, threw a formula across a table to Mancuso. Mancuso maintained that this formula was for an acid inhibitor, that Young's formula was unworkable, and that Mancuso's chemist refined it and turned it into a viable product. This refined product was sold as "Can–Hib." In this present action, Miller contends that this so-called "Gary Young alibi" is false and that Mancuso committed the predicate RICO acts of obstruction of justice, mail fraud and wire fraud during and after the Carr Litigation. Miller claims that Mancuso committed these acts during the Carr Litigation by conspiring with Carr and asserting the Gary Young alibi in declarations and deposition testimony in that case. Miller also accuses Mancuso of continuing

---

1. I state the facts in the light most favorable to Plaintiff, the non-moving party, and take its allegations as true when supported by proper proofs wherever those allegations conflict with those of Defendant. *See Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004).

2. For the purpose of this motion, I will assume the formula for Activol is a trade secret.

to commit predicate acts of racketeering by using the mails and wires to sell an acid inhibitor based on the misappropriated Activol formula and by continuing to assert the Gary Young alibi in this action.

After combing all of Miller's meandering submissions in support of its RICO claims, I have determined that the only facts that Miller presents arguably relevant to its RICO claims are the following:

- During the Carr Litigation, Paul Carr filed two false declarations. In Carr's first declaration, dated January 8, 1998, Carr denied that he misappropriated plaintiff's trade secret. Carr asserted that his company, Carr–Chem, had developed its own inhibitors with the assistance of outside blenders. Plaintiff's Ex. 33.[3]

- In Carr's second declaration, dated January 15, 1998, Carr again denied that he had stolen plaintiff's formula for Activol. He denied that his product, Can–Hib, was identical to Activol. Plaintiff's Ex. 34. Carr declared that he had purchased the original acid inhibitor formula from a man named Gary Young, but that Carr Chem had also refined, reformulated and experimented with that formula. Id.[4]

- At his deposition in the Carr Litigation,[5] Carr testified that Carr Chem never owned a formula for an acid inhibitor. Plaintiff's Ex. 1 at 36:6–23, 37:1.

- Carr also testified that Mancuso owned the formula for Can–Hib 1991 because "they [Mancuso] took a for-

mulation given to them by Mr. Gary Young and developed that to a formula that was workable." Id. at 41:1–10.

- Carr denied that he and Mancuso ever entered into a formal contract and insisted that a "gentlemen's agreement" governed their dealings. Id. at 57:2–13.

- During discovery in the Carr litigation, Mancuso produced a purported confidentiality agreement between Carr and Mancuso, signed by Mancuso's general manager John Henstock, and dated December 28, 1990. Plaintiff's Ex. 20. The agreement imposes on Mancuso the following obligations:

-Mancuso will keep confidential all "information, drawings, specifications, data, know-how and all other communication, oral or written," disclosed or provided to Mancuso by Carr Chem, Inc. regarding Carr Chem, Inc. ("Information").

-Mancuso will not use any Information other than for the purpose of blending and/or reacting CAN–HIB–1991 and other formulations marked "confidential."

-Mancuso's officers and employees are similarly bound to maintain the confidentiality of Information communicated to them.

-All tangible Information shall remain the property of Carr Chem, Inc.

- During the course of the Carr Litigation, employees of Mancuso filed sworn declarations attesting that they

---

**3.** This declaration was filed as part of the Cross–Motion for Dismissal or Transfer of Venue of Defendants Carr Chem, Inc. and Paul Carr. Plaintiff's Ex. 98. It was sent from Buffalo, New York, to Philadelphia via overnight delivery.

**4.** This declaration was signed on Grand Island, New York, and filed with the Memoran-

dum of Law of Defendants in Opposition to Motion of Plaintiff for Preliminary Injunction. Plaintiff's Ex. 50.

**5.** For the purposes of this motion only, I will consider Carr's prior deposition testimony. I do not now, however, rule on its ultimate admissibility at trial.

had personal information relevant to the litigation, and that the substance of each of their testimony was "explained more fully in the Declaration of Paul Carr...." Plaintiff's Ex. 35–37. Each declaration was transmitted by facsimile from Paul Carr's attorney in Buffalo, New York to each declarant. Plaintiff's Ex. 97. These individuals purportedly adopted Paul Carr's falsehoods through their declarations.

- Numerous other individuals at various steel and chemical companies also filed declarations in support of Carr. Plaintiff's Ex. 90–96.
- James Mancuso, a Mancuso employee, submitted a second declaration in which he corroborated Carr's explanation for the origins of Can–Hib. Specifically, James Mancuso declared that the defendant had obtained an "unworkable" formulation and that defendant had refined it into a viable product for Carr Chem. Plaintiff's Ex. 39 at ¶ 14. James Mancuso also asserted that there were no written agreements between Mancuso and Carr Chem. *Id.* at ¶ 16.
- James Gallagher, a former Mancuso employee, also submitted a declaration dated February 26, 1998, asserting that Mancuso obtained the acid inhibitor formula from Gary Young. Plaintiff's Ex. 38 at ¶ 3. Gallagher also spoke by telephone with Carr's attorney regarding his declaration and again before his deposition. Plaintiff's Ex. 88 at 129–131.
- Carr testified at his deposition during the Carr litigation that he spoke in person about the case to Antonio Mancuso, president of defendant, and that they discussed the January 3, 1991, meeting with Gary Young during which Young purportedly gave

Mancuso a formula. Plaintiff's Ex. 2 at 227–228.

- Carr also testified that he spoke to Antonio Mancuso by telephone and had numerous conversations with Mancuso personnel regarding the litigation; some of these conversations involved Carr's attorney. *Id.* at 229–239.
- Antonio Mancuso testified that he spoke to Carr's attorney by telephone once about his declaration. Ex. 5 at 229–231; Ex. 6 at 255–256; Ex. 7 at 313–325.
- James Mancuso testified that he asked Carr to send him the location of his deposition by facsimile. Ex. 86 at 107.
- Carr and Carr Chem settled with Miller on March 15, 1999, without admitting any liability. The Carr defendants agreed to:

  -Pay Miller $350,000.

  -Renounce all rights to any line of hydrochloric acid inhibitors sold, owned or marketed by the Carr defendants.

  -Assign to Miller any and all rights and title to any line of hydrochloric acid inhibitors sold, owned or marketed by the Carr defendants, including "any rights or claims against Mancuso Chemical, Inc. with respect to such products and formulae."

  -Be permanently enjoined from disclosing information about any hydrochloric acid inhibitors sold, owned or marketed by the Carr defendants.

Plaintiff's Ex. 40, at ¶¶ 2, 5–6, and 10.

Miller contends that Carr's and Mancuso's conduct after the settlement also supports its RICO claims. Miller alleges:

- After the Carr–Miller settlement, Carr contacted Mancuso's former employee, James Gallagher, to inquire whether Gallagher's daughter, a Canadian attorney, could review the settlement

agreement and determine its enforceability in Canada. Plaintiff's Ex. 8 at 135–142.

- Bruce Entwisle, Miller's President, informed Dofasco of the settlement and of Miller's readiness "to supply you with the same product you have been buying since you started using hydrochloric acid inhibitor." Plaintiff's Ex. 41.

- Miller also notified Dofasco that Carr had "no right" to sell Can–Hib. *Id.*

- Carr informed Dofasco that Mancuso had developed Can–Hib 1991, and that Mancuso would continue to supply the product to Dofasco. Plaintiff's Ex. 42.

- In a subsequent letter dated July 21, 1999, Carr informed Dofasco that, "the formula for Can–Hib–1991 purchased by Dofasco and Stelco from Carr Chem since 1991, is owned and blended by Mancuso Chemical." Plaintiff's Ex. 85.

- Antonio Mancuso visited Dofasco and expressed his belief that the Carr settlement did not affect "Mancuso's ownership of the formula for CanHib 1991...." Plaintiff's Ex. 10, at 9–10.

- Antonio Mancuso testified that Mancuso renamed Can–Hib to "Man–Hib," but that the products were identical. Plaintiff's Ex. 5, 260–261.

- Antonio Mancuso testified that two of Mancuso's largest customers, Dofasco and Stelco, never paid Mancuso directly for their purchases of Can–Hib; instead, those customers paid Carr, who in turn paid Mancuso. Plaintiff's Ex. 5, at 124. *See also* Plaintiff's Ex. 69, 70, 74, and 100 (invoices).

- In its responses to Miller's interrogatories in this case, Mancuso asserted that Gary Young gave Antonio Mancuso an unworkable formula, which Mancuso transformed into a viable product. Plaintiff's Ex. 9, pp. 16–17.

Mancuso continues to assert the Gary Young alibi in this action.

- Miller also presents documentation to show the Gary Young alibi is false. For example, Miller presents a Material Safety Data Sheet for Can–Hib 1991 (dated November 9, 1990), which identified Carr Chem as the manufacturer. Plaintiff's Ex. 15. Miller also presents a memorandum dated November 29, 1990, from Carr Chem to Dofasco, which identified "Can–Hib" as a registered trademark of Carr Chem, Inc. Ex. 18, Ex. 3, at 187. These documents suggest that Can–Hib was in existence prior to the meeting with Gary Young on January 3, 1991.

## IV. Legal Standard

Summary judgment should be granted under Federal Rule of Civil Procedure 56(c) "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive summary judgment, a plaintiff must make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## V. Analysis

Miller contends that Carr, Carr Chem and Mancuso formed an enterprise that engaged in a pattern of racketeering activity consisting of obstruction of justice, mail fraud, and wire fraud. Am. Compl., ¶¶ 38–41. In order to prevail on a RICO claim brought under § 1962(c), a plaintiff must show that the defendant (1) conducted or participated in the conduct of; (2) an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima SPRL v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Miller does not present sufficient evidence on an essential element of a RICO claim, the existence of an enterprise. Thus, summary judgment will be granted on Miller's RICO claims.[6]

### A. Enterprise

■ An enterprise can include "any individual, partnership, corporation, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). It is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Miller asserts that Mancuso, through its agents, formed an association-in-fact enterprise with Carr and Carr Chem. The enterprise set out to lie under oath during the Carr Litigation, to continue to profit from a stolen formula and to delay the vindication of Miller's rights. Am. Compl. ¶¶ 36–47. To establish an association-in-fact enterprise, a plaintiff must present sufficient evidence to establish all of the following: (1) "an ongoing organization, formal or informal"; (2) that "the various associates function as a continuing unit"; (3) that the enterprise exists "separate and apart from the pattern of activity in which it is engaged." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524 (*"Turkette* factors").[7]

### 1. An ongoing organization

■ To establish a RICO enterprise under Third Circuit law, Miller must first present facts that would establish an ongoing organization with a "decision-making structure." *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir.1983), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), *abrogation on other grounds recognized by United States v.*

6. A threshold issue in a RICO action is always whether the plaintiff has standing. 18 U.S.C. § 1964(c) authorizes civil RICO suits and confers standing on any plaintiff injured in his or her business or property "by reason of" a violation of § 1962. Miller has alleged that defendant's litigation tactics generated legal expenses and delayed the Carr litigation to plaintiff's detriment. *See Malley–Duff v. Crown Life Ins. Co.*, 792 F.2d 341, 355 (3d Cir.1986) (plaintiff had standing to assert civil RICO claim where it alleged great expense and delay by reason of defendant's obstruction of justice). Under *Malley–Duff*, Miller has standing.

7. Miller contends "the Third Circuit has recognized that the determination of whether a

RICO enterprise has been demonstrated raises of [sic] questions of fact to be resolved for the jury ..., and Mancuso's motion for summary judgment should be denied on this ground alone." Plaintiff's Opp., p. 18 (citing *United States v. Riccobene*, 709 F.2d 214, 223 (3d Cir.1983)). Miller's argument suggests that all "questions of fact" are necessarily immune to summary judgment, which is incorrect. The purpose of summary judgment is to limit for trial those issues that involve genuine factual disputes and to resolve factual questions where the record is unequivocal. Where the record does not support plaintiff's position, there is no factual dispute to be resolved by the jury.

*Vastola,* 989 F.2d 1318, 1330 (3d Cir.1993).[8] Miller has failed to do so. The decision-making structure can be hierarchical or consensual. *Id.* There must be, however, "some mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis." *Id.* An agreement to commit criminal activity does not alone constitute an enterprise. *Gates v. Ernst & Young,* 93–CV–2332, 1994 WL 444709, *1 (E.D.Pa.1994) (Buckwalter, J.) ("An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity.")

Miller's first task is to establish that a jury could find that the Mancuso–Carr–Carr Chem enterprise has sufficient structure. In *Riccobene,* 709 F.2d 214, and *Town of Kearny v. Hudson Meadows Urban Renewal, et al.,* 829 F.2d 1263 (3d Cir.1987), the Third Circuit instructs on the content of the required structure. In *Riccobene,* the Court considered a non-exhaustive list of criteria for structure: the internal hierarchy of the members, the members' routinized activity, and their specific roles and responsibilities. In that case, the defendants were members of a notorious "crime family" in Philadelphia. *Id.* at 216. Each defendant played a distinct role with specific responsibilities. Angelo Bruno was head of the family. Philip Testa served as his "underboss." *Id.* at 217. Harry Riccobene, Frank Sindone, and others worked as "supervisors" under Testa. *Id.* Riccobene's main job was to lend out the leadership's money as part of his loansharking business. *Id.* at 223. Joseph Ciancaglini worked for Sin-done to coordinate the enterprise's illegal numbers operations, and he collected the cash every Wednesday from those games. *Id.* at 223. The other associates were distinctly minor players, such as Mario Riccobene, Harry Riccobene's brother and his partner in the loansharking business. Mario also worked as Bruno's driver. A few remaining defendants worked on ancillary gambling schemes, which Ciancaglini ran and Bruno approved. This included a phony craps game in New Jersey. *Id.* at 220.

Riccobene and his associates were nothing if not mindful of the hierarchy within which they worked. Lower level associates discussed the "proper degree of respect" to show to leaders in particular positions. *Id.* at 225. Some of the senior members voted on advisors for the group, or the " 'consigliere[s],' " while more junior associates complained of being shut out of the election process. *Id.* at 222 & n. 10 (Harry Riccobene complained that "it isn't like it used to be, where everybody was invited [to vote]."). Even the supervisors observed a hierarchy. When Harry Riccobene lamented the lack of a uniform profit-sharing policy among operators of the numbers games, Ciancaglini reported the complaint to his boss, Sindone. Sindone declined to decide the important issue and elevated it to Bruno. *Id.* at 223. Taking this evidence as a whole, the Third Circuit found that the government had proven a decision-making structure that established the existence of a RICO enterprise.

In *Town of Kearny,* the Town of Kearny sued a real estate developer, Mimi Corp.

---

8. In *Vastola,* the Third Circuit reviewed a jury verdict that found the defendant guilty of violating RICO, but not guilty of the underlying offenses required to support the RICO conviction. The Court declined to reverse the conviction, finding that inconsistent verdicts did not mandate acquittal where the evidence was otherwise sufficient to support the conviction for the "compound offense." *Id.* at 1329, 1330. The Court determined that the Supreme Court had overruled *Riccobene* to the extent *Riccobene* supported reversal in such a case. *Id.* at 1330.

("Mimi"), for bribing its town council members in violation of RICO. Another real estate developer, Hartz, intervened. The Town of Kearny and Hartz had entered into a leasing and option agreement with the right of first refusal for development of a large tract of the Town of Kearny meadowlands. When the ink dried, the Mayor of the Town of Kearny and members of the Kearny Town Council met with another private developer, Mimi Corp. In exchange for a bribe of $75,000, the mayor and certain council members agreed to grant Mimi the right to develop part of the Town of Kearny meadowlands. *Id.* at 1265. The Town Council passed a resolution approving development on Mimi's desired tract and executed to Mimi a leasing and option agreement for the land. Mimi then paid two installments of the bribe, one for each official step along the way—the resolution approving development, and the execution of the lease agreement. Hartz learned of the deal with Mimi a month later and protested to the Town of Kearny that the Mimi lease violated its right of first refusal. Mimi withheld the final installment of the bribe until the Town Council took an official act siding with Mimi. *Id.* The Town Council met and passed a resolution to send a letter to Hartz saying that the Hartz and Mimi lease agreements were not in conflict. *Id.* Members of the Town Council met with Mimi's attorney, who drafted the letter. Mimi then paid the last installment of the bribe. *Id.* The Town of Kearny sued Mimi and alleged that Mimi's officers and certain members of the Town Council had formed a racketeering enterprise.

The district court ruled that plaintiff had presented facts sufficient to establish an association-in-fact enterprise, and the Third Circuit affirmed that conclusion (but reversed other aspects of the lower court's decision).[9] The members of the RICO enterprise held defined roles. Mimi provided money for the scheme, while the Kearny defendants "took the necessary action" in executing the Mimi lease agreement and passing a resolution regarding the letter to Hartz. *Id.* The members also worked within a decision-making structure. When confronted by Hartz's protest, the Town Council members passed a resolution to authorize a letter to Hartz. At the same time, the responsibility for drafting the letter consistent with the resolution was placed in the hands of Mimi's attorney. *Id.* Mimi defined the ultimate objective, but the Town Council members facilitated that objective through the misuse of their municipal authority. *Riccobene* and *Town of Kearny* suggest that a division of labor and chain of command are hallmarks of an "enterprise."

In *In re American Investors Life Ins. Co. Annuity Marketing and Sales Practices Litig.*, the plaintiffs alleged that three groups of defendants formed a racketeering enterprise to sell annuities to elderly buyers under fraudulent terms. The three groups of defendants were the "annuity group," which issued, underwrote and profited from the fraudulent sales; the "sales group," which contacted potential customers and induced them to purchase fraudulent living trust kits; and the "attorney group," which allegedly prepared the living trust instruments. MDL No. 1712, 2006 WL 1531152, at *4–5 (E.D.Pa. June 2, 2006 (McLaughlin, J.)). Plaintiffs alleged that members of the sales group were

---

**9.** The district court had reasoned that the Mimi–Town of Kearny enterprise had perpetrated at least two bribery schemes, only one involving Hartz. Therefore, Hartz could not prove injury to its business or property by reason of the pattern as opposed to the "isolated Mimi transaction." *Id.* at 1268. The Third Circuit reversed, finding that a RICO plaintiff needs only to prove harm on account of one predicate act, not the entire pattern.

agents of the attorneys and the annuity group; but there were no allegations regarding the relationship of the annuity group to the attorneys. *Id.* The Court granted a motion to dismiss, ruling that plaintiffs had not alleged an enterprise, because plaintiff had failed to state how the defendants "would have worked together to make decisions or resolve disputes." *Id.* at *7. Although each group of defendants performed a distinct role (underwriting annuities, selling annuities and trusts, and drafting the necessary legal documentation), the Court ruled that this was insufficient to allege a decision-making structure because "[p]articipants in any conspiracy will play certain roles and have some idea of what the other participants are doing." *Id.* at *8. The Court deemed it significant that plaintiffs had alleged an association-in-fact, as opposed to an enterprise composed of, e.g., a parent corporation and two subsidiaries, where an organizational structure between a parent and its subsidiaries largely can be assumed. *Id.* (discussing *Shearin v. E.F. Hutton Group,* 885 F.2d 1162 (3d Cir.1989)).

Other cases illustrate where there is insufficient evidence of structure and the association alleged is merely a conspiracy. Where the claimant has inadequately distinguished a conspiracy from a racketeering enterprise, courts have shown no reluctance in dismissing a RICO claim. *See, e.g., VanDenBroeck v. CommonPoint Mortgage Co.,* 210 F.3d 696, 700 (6th Cir. 2001) (conspiracy to defraud plaintiffs did not amount to enterprise where the parties were not "organized in a fashion that would enable them to function as a racketeering organization for other purposes."); *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 676 (7th Cir.2000) (buying club, its directors and officers, and franchisees did not constitute an enterprise where plaintiff failed to allege a "command structure" separate from the buying club); *Si-*

*mon v. Value Behavioral Health, Inc.,* 208 F.3d 1073, 1083 (9th Cir.2000) (no RICO enterprise where plaintiff did not allege facts to show a "system of authority" among members of the enterprise).

In *Bachman v. Bear, Stearns & Co., Inc.,* an opinion authored by Chief Judge Richard Posner, a former employee-shareholder sued the investment company Bear Stearns for violating RICO, and the Court affirmed the dismissal of the complaint for failure to plead the existence of an enterprise. 178 F.3d 930, 931 (7th Cir.1999). Plaintiff was vice president of a medical imaging company, known as Calumet Coach Corp. ("Coach"). Plaintiff also owned shares in Coach's parent corporation, known as Calumet Acquisitions Corp. ("Calumet"). *Id.* Merrill Lynch Interfunding, Inc. (MLIF) was the majority shareholder in Calumet. *Id.* Plaintiff's employment agreement provided that, if he left Coach, other shareholders would have the right to buy out his stock in Calumet at a fair market value to be determined by a firm designated by MLIF. *Id.* Coach then fired the plaintiff. The CEO of Calumet and Coach, Dan Snyder, hired Bear Stearns to determine the value of plaintiff's stock. *Id.* Snyder and the vice president of MLIF, John Ferrell, allegedly directed Bear Stearns to undervalue plaintiff's stock, and Bear, Stearns issued a fraudulent valuation. *Id.* Bear Stearns then assisted Snyder and Ferrell in a lawsuit plaintiff brought in state court by "concealing evidence and presenting perjured testimony." *Id.* Plaintiff later sued Bear Stearns in federal court for violating RICO. *Id.* Judge Posner found that plaintiff had failed to plead the existence of a RICO enterprise, even though Bear Stearns had collaborated with Calumet's CEO and MLIF's vice president for many years. *Id.* Judge Posner found that the alleged conspirators had collaborated

for many years not because they had formed an ongoing organization, but because of the "nature of the fraud, which involved the manipulation of contractual rights, and of the fact that the [plaintiff] brought a lawsuit." *Id.* at 932. None of plaintiff's allegations suggested that Bear Stearns and its co-conspirators had created even a "loose-knit" organization. *Id.*

Miller similarly shows no indicia of structure. When considering the indicators identified in *Riccobene*—an internal hierarchy, routinized activity, and specific roles and responsibilities—the dearth of evidence is clear. Miller demonstrates that Carr and Antonio Mancuso had a longstanding business relationship relating to the manufacture and sale of Can–Hib, and that Antonio Mancuso and his employees assisted Carr in Carr's defense. But, Miller provides no evidence that Mancuso, Carr, and Carr Chem formed a formal or informal organization with any degree of structure. In its initial opposition to defendant's motion for summary judgment on the RICO claims, Miller cites to the record only twice in its discussion of the "enterprise" element. Plaintiff's Opp., pp. 16–20. Miller identifies evidence that Mancuso advanced the purportedly false "Gary Young alibi" in its interrogatory responses in this litigation and that Carr and Antonio Mancuso engaged in business transactions. Plaintiff's Ex. 9, pp. 16–17 & Ex. 5, at 20–21. In its Sur-reply, Miller points to scant evidence that Carr and Antonio Mancuso discussed the Carr litigation, and that Carr personally requested Mancuso employees to assist him in his defense. Plaintiff's Ex. 2, at 231–232. Carr filed a declaration in which he identified Mancuso employees as "potential witnesses." Plaintiff's Ex. 33. Antonio Mancuso and Carr met with James Mancuso (Antonio Mancuso's son) at Mancuso's offices, and Carr later requested that they produce documents relating to changes in

the Can–Hib formula from 1991 to the present. Plaintiff's Ex. 2, at 231–232. Carr also requested Antonio Mancuso and other Mancuso employees to sign declarations in support of his motion to transfer venue to the Western District of New York. Plaintiff's Ex. 5 at 229–230. Finally, Carr filed a pretrial memorandum in which he continued to advance the false Gary Young alibi. Plaintiff's Ex. 108.

After Carr and Miller settled their dispute, Carr sent a letter to Dofasco dated March 19, 1999, to notify them that Mancuso would continue to service their product, but Carr omitted the fact that he had assigned to Miller his rights to Can–Hib. Plaintiff's Ex. 42. Mancuso also visited Dofasco after the Carr settlement and reassured Robert Julien, the Dofasco manager in charge of purchasing, that Mancuso would continue to sell Can–Hib under the trade name "Man–Hib." Plaintiff's Ex. 5 at 260. Mancuso purportedly sent Julien a letter to that effect, although no one ever located the letter. Plaintiff's Ex. 56 at 128. Dofasco requested Carr to respond to Bruce Entwisle's letter, so Carr wrote to Dofasco again, this time asserting that Mancuso had always owned the formula for Can–Hib. Plaintiff's Ex. 85.

None of these facts establish a basis on which to conclude that Mancuso, Carr and Carr Chem formed an enterprise with any kind of decision-making "superstructure." *Riccobene*, 709 F.2d at 222. Miller presents no facts to prove how the enterprise made decisions, resolved disputes, or delegated responsibility. Miller has not identified any portion of the record that would answer the questions of whether Carr answered to Mancuso, Mancuso answered to Carr, they operated as equals or both answered to some third person or entity, such as Carr's attorney. *See* Deft.'s Reply, p. 37. Miller has presented no evidence whatsoever of a "system of authori-

ty," formal or informal. *Simon*, 208 F.3d at 1083. Miller similarly fails to identify and substantiate what roles or responsibilities members of the enterprise held or what routinized activity the members engaged in that would reveal the existence of an ongoing operation.

As in *Bachman*, that Carr and Mancuso defrauded Miller and collaborated over the course of the Carr Litigation would be insufficient to prove the existence of an enterprise. At most, their continuing collaboration evidences a conspiracy or development of a joint defense; but not all conspiracies are RICO enterprises. *See Seville Industrial Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 790 n. 5 (3d Cir.1984) (criminal conspiracy standing alone does not constitute an enterprise); *Simon*, 208 F.3d at 1083 (all illegal concerted activity not a RICO enterprise). Without evidence that conspirators are organized according to some internal hierarchy, have engaged in routinized activity, and have held specific roles and responsibilities, there is no structure, and therefore, no enterprise. *See Riccobene*, 709 F.2d at 222.

2. Continuing Unit

▇▇▇ Miller also fails to substantiate the second *Turkette* factor. Because Miller has failed to adduce sufficient evidence to support a finding that the alleged enterprise had a decision-making structure, Miller cannot establish the second requirement of an enterprise, i.e., that the associates of the alleged enterprise functioned as a "continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. The "continuing unit" requirement means that the associates of the enterprise must "perform a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization." *Riccobene*, 709

F.2d at 223. Without a decision-making structure, however, it is futile to inquire whether particular individuals occupied particular roles within that structure. *In re American Investors Life Ins. Co.*, 2006 WL 1531152, *9 n. 6.

3. Existence Separate and Apart from Pattern of Racketeering

I have already determined that Miller has failed to establish a genuine issue of material fact regarding the existence of an enterprise. It is unnecessary to consider the final *Turkette* element, whether Miller would be able to prove the existence of an enterprise separate and apart from a pattern of racketeering. For all of the above reasons, Miller's claim under § 1962(c) fails.

B. RICO Conspiracy

▇▇▇ Miller has also alleged that Mancuso conspired to violate RICO and is liable under § 1962(d). A defendant may be liable for a RICO conspiracy merely by conspiring with individuals who violate § 1962(c)—"even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element [of § 1962(c) ]." *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir.2001) (interpreting *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)) (emphasis in original). Miller contends that a jury should decide whether Mancuso and Carr entered into a conspiracy at the moment they made up the Gary Young alibi. Plaintiff's Surreply, p. 109. But without a RICO enterprise, the claim cannot succeed: there can be no knowledge of and agreement to facilitate the enterprise's scheme as required by *Salinas*. *Salinas*, 522 U.S. at 66, 118 S.Ct. 469. *See also Smith*, 247 F.3d at 537 n. 9 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive

criminal offense....") Because Miller cannot prove the existence of any racketeering enterprise, Miller cannot prove there was an agreement to facilitate the enterprise's activities. Miller's claim under § 1962(d) also fails.

## VI. Conclusion

The summary judgment record relating to Miller's RICO claims reveals "a complete failure of proof concerning an essential element of the nonmoving party's case...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, I grant the defendant's motion for summary judgment on plaintiff's RICO claims.

### *ORDER*

**AND NOW**, on this *22nd* day of December, 2006, defendant's motion for summary judgment on Counts II and III in the Amended Complaint (Doc. # 278) is **GRANTED**.