[Cite as *State v. Kozic*, 2014-Ohio-3788.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | CASE NO. 11 MA 160 |
| V. | ) | |
| | ) | OPINION |
| ZOLTAN AKA JOEY KOZIC, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 10CR506

JUDGMENT:          Affirmed in part
Reversed in part
Remanded

APPEARANCES:
For Plaintiff-Appellee          Paul Gains
Prosecutor
Ralph M. Rivera
Assistant Prosecutor
21 W. Boardman Street, 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant          Attorney Peter Galyardt
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: August 27, 2014

DONOFRIO, J.

{¶1} Defendant-appellant Zoltan Kozic was convicted of five counts of burglary, two counts of drug trafficking, and a single count of engaging in a pattern of corrupt activity following a jury trial in Mahoning County Common Pleas Court and sentenced to an aggregate term of imprisonment of eighteen years. He appeals his conviction and sentence.

*Main Market Road*

{¶2} This case stems from a rash of burglaries that occurred in Columbiana, Mahoning, Trumbull, and Geauga Counties in late 2009 and early 2010. On November 24, 2009, Chris Natali returned from work to his home at 16663 Main Market Road in Parkman, Geauga County, Ohio, to find a knife collection box he kept near the fireplace had been thrown to the ground. Upstairs, he found dresser drawers pulled out and a coin collection and other items missing, including a credit card. Natali notified police and later was notified by the credit card issuer that the card was being used fraudulently. One of those fraudulent transactions occurred at a gas station. Video surveillance footage taken from the gas station when the card was used fraudulently showed Jennifer Kozic exiting a green Cadillac and a red Jeep was nearby which appellant's codefendant, Jamie Kozic, was known to drive.

*Mystic Rock Road*

{¶3} On December 27, 2009, Jareth Gaudio and his wife left their home at 13831 Mystic Rock Road in Columbiana, Mahoning County, Ohio, to take one of their sons to the airport. They returned home to find their front door kicked in and medication, money, a television, and jewelry missing. Police responded and a canine unit picked up a scent that led to the nearby home of Orazio Merlo. A few weeks later Merlo found a cellular phone near her mailbox and turned it over to police. Through the phone's cellular service provider, the police determined that the phone belonged to appellant's wife, Heather Kozic who resided at 238 Wilson Street, Struthers, Ohio 44471.

*McCoy Avenue*

{¶4} On January 22, 2010, Cathy Applegate was returning from work to her

home located next to an apartment building on McCoy Avenue in East Liverpool, Ohio. A driver sitting in a parked car nearby caught her attention as strange. She then observed two white males going from the front of an apartment building to the back. When she got home, she told her husband, Lawrence Applegate III, about what she had observed. She then headed back out with her daughter to take her to a school function. She observed double sliding glass doors open and the curtains blowing and told her husband to call the police. Lawrence observed two people coming from the back of the apartment building put something they had been carrying into the trunk of a car parked nearby. He called the police after the car sped away.

{¶5} Brandy Ramirez, who lives across the street from the apartment building, observed two males coming from the back of the apartment building. She made eye contact with one of them before he drove away. She later identified appellant from a photo array as being that person.

{¶6} Susan Williams returned to her home at the apartment building on McCoy Avenue to find the back sliding glass door to her kitchen open. She found money lying on her patio, pill bottles thrown, and her bedroom a mess. Three televisions, $300, and jewelry were missing from her apartment. A latent fingerprint taken from the scene matched the right index finger of appellant's codefendant, Jamie Zoltan.

*New England Square*

{¶7} On January 25, 2010, Ronald Sines returned from work to his home at 46014 New England Square in New Waterford, Columbiana County, Ohio. He noticed things out of place and thrown about and that the back sliding glass door had been pried open. A digital music player, $37.40 in change, and five rings were missing. Police processing the scene noticed that his neighbor's back door was also open.

{¶8} Mark Liber returned to his home at 46022 New England Square in New Waterford, Columbiana County, Ohio to find police investigating a burglary next door

at his neighbor's home. Liber discovered his back door open and that his own home too had been burglarized. Missing were a computer, two televisions, purses, a camera, and some jewelry.

*South Pointe*

**{¶9}** Rebecca Ashbridge lives at a condominium, Unit 55-D, located in a condominium development known as South Pointe, at 9191 North Lima Road, in Poland Township, Mahoning County, Ohio. On January 30, 2010, she returned home to find the front door unlocked. Inside, the home had been ransacked and a television, gaming system, and various jewelry pieces were missing.

*Shepherd of the Valley*

**{¶10}** At a retirement community known as Shepherd of the Valley, William Wade lives in a condominium, Unit 306, located at 9111 Sharrott Road, Poland, in Beaver Township, Ohio. On February 3, 2010, he returned home to find the back door open. A handgun, cash, and watch were missing. Police took casts of pry marks left around the back door and submitted them to BCI for analysis.

*Stone Gate*

**{¶11}** On February 6, 2010, a condominium, Unit 202, located in the Stone Gate housing development at 9264 Sharrott Road was found broken into by Doug Dilullo. Dillulo was a construction manager for the development for which this unit was the model unit. It was fully furnished with utilities turned on and Dilulo checked on it once a week. He found that the front door jamb was broke and that the unit had been broken into, although there was nothing taken.

*Ivy Hills*

**{¶12}** On February 14, 2010, James Fedor discovered that his mother's condo had been broken into. A side patio door was open and there were pry marks on a rear patio door which was also open. The condo was located at 8550 Ivy Hills, Unit 20 in Boardman, Ohio. The bedroom had been ransacked and a television and jewelry were missing. The condo had been vacant since December 26, 2009, when his mother had passed away.

*West Park Avenue*

**{¶13}** On February 5, 2010, Michael Naughton, who lived in a triplex condominium at 840 West Park Avenue in Hubbard, Trumbull County, Ohio, heard a loud noise coming from his attached garage. When he went to check on the noise, he observed that a door to the garage had been pried and knocked partially off the door jamb. He then called the police.

**{¶14}** Meanwhile, a letter carrier for the United State Postal Service and a bypassing motorist observed an individual in that area acting suspiciously. A description of the individual was broadcast to other police officers and, subsequently, Hubbard Officer Gerald Smith encountered appellant's codefendant, Jamie Kozic, nearby and arrested him following a positive identification by the letter carrier and the motorist. A screwdriver was recovered from Jamie Kozic's red Jeep Cherokee.

**{¶15}** Following the rash of burglaries, law enforcement had conducted numerous controlled buys of oxycodone from appellant, Zoltan Kozic, and Jennifer Kozic.

**{¶16}** On May 20, 2010, a Mahoning County grand jury issued a twenty-two count indictment alleging a criminal enterprise among appellant, Zoltan Kozic, and Jennifer Kozic. Of those twenty-two counts, appellant was indicted on nine counts: six counts of burglary in violation of R.C. 2911.12(A)(2)(C) (second-degree felonies); two counts of drug trafficking in violation of R.C. 2925.03(A)(1)(C)(1)(c) (third-degree felonies); and one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1)(B) (first-degree felony).

**{¶17}** On August 1, 2011, the day set for trial and before the trial commenced, each of the defendants made renewed motions for severance of the trial as to defendants and as to counts in the indictment. Prior to trial, each of the defendants had filed formal written motions for severance which the trial court had earlier denied. This time, the trial court again denied the motions as to appellant and Jamie Kozic, but granted Jennifer Kozic's motion to sever her case for trial based on a perceived *Bruton* issue. (Trial Tr., Vol. I, 74-83.) Apparently, the state wanted to call a witness

who was in the jail with Jennifer Kozic and heard her talking about her involvement in the crimes alleged in the indictment, including her brother's Jamie Kozic's and appellant's roles in those crimes.

**{¶18}** In *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Bruton was convicted of armed postal robbery after a joint trial with his co-defendant, Evans. At trial, a witness testified that Evans confessed to him that Evans and Bruton committed the robbery. Evans did not testify. The trial court instructed the jury that they were only to consider Evans' confession against Evans and were not permitted to consider it against Bruton. The Supreme Court reversed Bruton's conviction holding that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Bruton*, 391 U.S. at 125.

**{¶19}** Jennifer Kozic later pleaded guilty to each of the counts she was charged with in the indictment with the engaging in a pattern of corrupt activity count amended from a first-degree felony to second-degree felony. She was sentenced to community control sanctions, later violated those community control sanctions by testing positive for illegal drugs and was sentenced to four years in prison.

**{¶20}** Appellant's and codefendant Jamie Kozic's trial proceeded before a jury. The state presented testimony from fifty-four witnesses and had sixty-seven exhibits admitted into evidence. The state's principal witness was Barry Stewart who, with the exception of the Main Market Road burglary in Geauga County and the West Park Avenue burglary in Trumbull County, had committed each of the burglaries with appellant and/or codefendant Jamie Kozic, including all of the Columbiana and Mahoning County burglaries. He testified in detail how they committed each of those burglaries and where they sold the stolen items afterwards.

**{¶21}** Following presentation of the state's case, the trial court granted appellant's Crim.R. 29 motion to dismiss count 1, stemming from the burglary on

Main Market Road in Geauga County. (Trial Tr., Vol. IX, 2020-2022.) On August 15, 2011, the jury found appellant guilty of all of the remaining counts for which he was indicted: five counts of burglary (counts 3, 5, 6, 7, and 8), two counts of drug trafficking (counts 14 and 15), and one count of engaging in a pattern of corrupt activity (count 22). The trial court sentenced him to an aggregate term of imprisonment of eighteen years. This appeal followed.

## Assistance of Counsel

{¶22} Appellant raises five assignments of error. Appellant's first assignment of error states:

Zoltan Kozic was deprived of his right to the effective assistance of counsel. Sixth and Fourteenth Amendments, United States Constitution; Section 16, Article I, Ohio Constitution. (Trial Transcript, at 732, 734, 794, 1228-1243, 1422-1430, 1538, 1842, 1848, 1867, 1887, 2020-2021, 2095); (July 1, 2010 Judgment Entry).

{¶23} The standard for determining ineffective assistance of counsel was set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). In order to demonstrate ineffective assistance of counsel, an appellant must first show that his defense counsel was deficient. *Id.* This requires that appellant show that his defense counsel's performance fell below an objective standard of reasonableness. *Id.* Secondly, an appellant must then prove that he was prejudiced by defense counsel's deficiency. This requires that appellant show that there is a "reasonable probability that but for [defense] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶24} Appellant alleges four areas of ineffective assistance of counsel, none of which demonstrate deficient performance on the part of his trial counsel or prejudice. First, appellant argues that his trial counsel was ineffective for inviting the admission of testimonial statements that violated the Sixth Amendment's

Confrontation Clause. Specifically, he refers to his trial counsel eliciting from Detective Eric Datillo on cross-examination that a confidential informant, Dino Barbato, implicated him in the rash of burglaries. (Trial Tr., VIII, 1842, 1848, 1867.) In this instance, appellant was not denied his right to confront under the Sixth Amendment. The state called Dino Barbato as a witness at trial and he was subjected to cross-examination by appellant's trial counsel.

{¶25} Second, appellant argues that his trial counsel invited or failed to object to the admission of unduly prejudicial, hearsay testimony of bad acts. Appellant points to testimony from Matthew Nicholson, the confidential informant who helped police conduct the controlled buys, and Barry Stewart, who participated in the burglaries along with appellant and his co-defendant, Jamie Kozic. Nicholson testified that appellant sold drugs to another person and used drugs himself during one of the controlled buys. (Trial Tr., Vol. III, 732, 734.) On cross-examination, appellant's counsel also elicited testimony from Nicholson about appellant's prior drug abuse and attempted theft. (Trial Tr., Vol. III, 794-795.) When Stewart testified, he referenced unindicted burglaries that he allegedly committed with appellant in Warren, Ohio and Pennsylvania. (Trial Tr., Vol. VII, 1538.)

{¶26} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith." Evid.R. 404(B). However, that evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). The list of acceptable reasons for admitting testimony of prior bad acts into evidence is non-exhaustive. *State v. Melton,* 11th Dist. No. 2009-L-078, 2010-Ohio-1278, at ¶ 78.

{¶27} It is important to note that the testimony appellant complains of is taken out of context. Video and audio recordings of those controlled buys were played for the jury. The bulk of Nicholson's testimony was simply describing to the jury what was going on during those controlled buys. That testimony, along with Stewart's, was clearly noncharacter testimony and would have been otherwise admissible to

demonstrate motive, opportunity, intent, preparation, plan, knowledge, or identity.

**{¶28}** Moreover, the Ohio Supreme Court has observed that "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

**{¶29}** The third area appellant cites as ineffective assistance of counsel concerns the trial court's granting his motion to dismiss count 1 (burglary) pursuant to Crim.R. 29. Appellant argues that there was "substantial" testimony presented that a burglary occurred and that appellant was involved in the "distribution" of an item taken during that burglary. (Trial Tr., Vol. V, 1228-1243; Trial Tr., Vol. VI, 1422-1430.) Appellant argues that his trial counsel was ineffective for failing to request an instruction for the jury to disregard the evidence that had been presented in support of that count.

**{¶30}** To the extent that appellant argues that the evidence for count 1 was then used by the jury as "other acts" evidence to convict on the other counts, it is important to note that this evidence was adduced prior to the dismissal of that count. The evidence was not introduced to prejudice the jury, but rather to prove the count that was at issue at the time.

**{¶31}** Additionally, good reason may have existed why counsel did not request a limiting instruction and why the trial court may not have wanted to sua sponte give an instruction. Any reminder to the jury about the count 1 evidence, beyond the evidence that they were about to consider, may have reinforced that other incident and arguably prejudiced them against appellant.

**{¶32}** The fourth instance of ineffective assistance of counsel appellant alleges concerns his right to a speedy trial. In particular, appellant points to his trial counsel's acquiescence to a continuation of the trial from July 1, 2010 to February 7, 2011. It is well established that a defendant is bound by the actions of counsel in waiving speedy-trial rights by seeking or agreeing to a continuance, even over the defendant's objections. *State v. McBreen*, 54 Ohio St.2d 315, 276 N.E.2d 593 (1978).

Justification for defense counsel's waiver of their client's speedy-trial rights include time to adequately prepare for trial as well as for conflicts in counsel's schedule. *Id.* Under the facts and circumstances of this case, the acquiescence of appellant's counsel to the continuance was reasonable and did not amount to ineffective assistance of counsel. Appellant made it clear that he wanted to the case against him taken to a trial. The case involved multiple counts stemming from a multi-count indictment (including a RICO count). Given the extensive and voluminous discovery involved, the seventh-month extension was a reasonable amount of time for appellant's counsel to agree to in order to properly prepare for trial.

{¶33} Accordingly, appellant's first assignment of error is without merit.

### Sufficiency & Weight of the Evidence

{¶34} Appellant's second assignment of error states:

> The trial court erred and violated Zoltan Kozic's rights to due process and a fair trial when, in the absence of sufficient evidence and against the manifest weight of the evidence, it convicted him of trafficking in drugs under R.C. 2925.03(A)(1) and (C)(1)(c). Fifth and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution; R.C. 2925.01(D)(1)(d). (September 2, 2011 Judgment Entry of Sentencing); (October 19, 2011 Amended Judgment Entry of Sentencing).

{¶35} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 6680 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113, 684 N.E.2d 668.

**{¶36}** Alternatively, a weight-of-the-evidence challenge requires an appellate court to review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In weighing the evidence and the reasonable inferences that can be drawn therefrom, if there exists two fairly reasonable views of the evidence, the reviewing court cannot simply substitute its judgment for the jury and choose the one it finds more persuasive or believable. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). In assessing the credibility of the witnesses, the reviewing court is guided by the principle that the credibility of the witnesses is primarily the responsibility and province of the jury. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). This is because the jury is in the best position to assess the credibility of a trial witness based on their observations of the witnesses' demeanor, gestures, and voice inflections. *Gore*, 131 Ohio App.3d at 201, 722 N.E.2d 125, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). In reviewing all of the evidence, a weight-of-the-evidence challenge requires the reviewing court to determine if the greater amount of credible evidence supported the jury's finding of guilt. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶37}** Reversal based on a successful weight-of-evidence challenge is reserved only for the exceptional case in which the evidence weighed so heavily against conviction that the jury clearly must have lost its way, creating a manifest miscarriage of justice. *Id*. Indeed, reversing on weight of the evidence after a jury trial is so extreme that it requires the unanimous vote of all three appellate judges rather than a mere majority vote. *Thompkins,* 78 Ohio St.3d at 389, 678 N.E.2d 541, citing Section 3(B)(3), Article IV of the Ohio Constitution (noting that the power of the court of appeals is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses).

**{¶38}** Under this assignment of error, appellant takes issue with his conviction on two counts of drug trafficking (counts 14 and 15), in particular the bulk amount element of those charges. Appellant was convicted of two counts of drug trafficking with a bulk amount penalty enhancement specification in violation of R.C. 2925.03(A)(1)(C)(1)(c).

**{¶39}** Drug trafficking is committed when a person knowingly sells or offers to sell a controlled substance. R.C. 2925.03(A)(1). Oxycodone is a Schedule II controlled substance. R.C. 3719.01(C) (defining "controlled substance" as including any Schedule II substance); R.C. 3719.41(A)(1)(n) (listing oxycodone as a Schedule II substance).

**{¶40}** Trafficking in such a substance is a fourth-degree felony unless a penalty enhancement provision applies. R.C. 2925.03(C)(1)(a). In particular, at the time appellant committed these offenses the Revised Code provided that if the amount of the drug involved equaled or exceeded the bulk amount but was less than five times the bulk amount, then trafficking was a third-degree felony requiring the sentencing court to impose a mandatory prison term, one of the prison terms prescribed for a third-degree felony. R.C. 2925.03(C)(1)(c).

**{¶41}** The bulk amount of a compound, mixture, preparation or substance that is or contains any amount of a schedule II opiate or opium derivative is defined as an amount equal to or exceeding twenty grams or five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual. R.C. 2925.01(D)(1)(d). A standard pharmaceutical reference manual is defined as including the current edition, with cumulative changes if any, of any of the following reference works: (1) The National Formulary; (2) The United States Pharmacopeia, prepared by authority of the United States Pharmacopeial Convention, Inc.; or (3) other standard references that are approved by the state board of pharmacy. R.C. 2925.01(M)(1)-(3). While the definition of bulk amount itself is a question of law, the question of whether the amount of a controlled substance possessed or sold by a criminal defendant exceeded the bulk amount is a question of fact. *State v.*

*Montgomery*, 17 Ohio App.3d 258, 260, 479 N.E.2d 904 (1st Dist.1984).

**{¶42}** Here, the state established that Oxycontin is oxycodone. Additionally, the state proved that appellant sold an informant five 80 milligram tablets of Oxycontin on March 25, 2010, and eight 80 milligram tablets on April 1, 2010. The state presented testimony from the informant (Trial Tr., Vol. III, 710-738), the detectives who supervised the controlled buys (Trial Tr., Vol. III, 625-637; Trial Tr., Vol. IV, 889-892; Trial Tr., Vol. VI, 889-892), as well as video and audio recordings of the buys (Trial Tr., Vol. III, 624; State's Exhibits 1, 2).

**{¶43}** Appellant's only argument here concerns whether the state presented adequate evidence to establish the applicability of the penalty enhancement provision. In other words, appellant argues that the state failed to prove that the amount of tablets sold on those two occasions equaled or exceeded the bulk amount in order to elevate those counts from fourth-degree to third-degree felonies.

**{¶44}** Therefore, the state had the option of proving appellant sold the bulk amount by either weight or by reference to the maximum daily dosage. *State v. Mattox*, 13 Ohio App.3d 52, 53, 468 N.E.2d 353 (2d Dist.1983), citing *State v. Howell*, 5 Ohio App.3d 92, 449 N.E.2d 523 (5th Dist.1981) (the use of the disjunctive "or" between the weight description and the dosage description in R.C. 2925.01 requires the state to prove either weight or dosage in determining whether the controlled substance was in excess of the bulk amount, but not both). More specifically, for drugs such as oxycodone, the Revised Code defines the bulk amount as an amount equal to or exceeding (1) twenty grams *or* (2) five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual. R.C. 2925.01(D)(1)(d).

**{¶45}** The state called two forensic scientists from the Ohio Bureau of Criminal Identification and Investigation (BCI) who analyzed the drugs that were recovered from the controlled buys that comprised counts 14 and 15 in this case. Jennifer Acurio analyzed the drugs from the March 25, 2010 controlled buy (count 14) and determined that the five 80 milligram tablets contained oxycodone. (Trial Tr.,

Vol. IV, 844-849.) Barbara DiPietro analyzed the drugs from the April 1, 2010 controlled buy (count 15) and determined that the eight 80 milligram tablets weighed 2.1 grams and contained oxycodone. (Trial Tr., Vol. IV, 872-873.)

**{¶46}** As for the first way the state could have proven the bulk amount (i.e., the weight method), DiPietro testified that the eight 80 milligram oxycodone tablets from the April 1, 2010 controlled buy (count 15) weighed 2.1 grams, an amount far less than the threshold amount of twenty grams required under R.C. 2925.01(D)(1)(d). Although Acurio did not testify as to the weight of the five 80 milligram oxycodone tablets from the March 25, 2010 controlled buy (count 14), since there were three less tablets, they presumably did not weigh any more than eight 80 milligram oxycodone tablets from the April 1, 2010 controlled buy (count 15). Thus, the state did not prove the bulk amount based on the twenty gram weight threshold method.

**{¶47}** The second way to establish bulk amount would have been to introduce evidence that the tablets equaled or exceeded five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual. Concerning this approach, some appellate courts have held that what constitutes the maximum daily dose is a question of fact which must be proved in one of three ways: (1) by stipulation, (2) by expert testimony as to what a standard pharmaceutical reference manual prescribes, or (3) by a properly proven copy of the manual itself. *State v. Huber*, 187 Ohio App.3d 697, 2010-Ohio-2919, 933 N.E.2d 345, ¶ 8 (2d Dist.); *State v. Montgomery*, 17 Ohio App.3d 258, 479 N.E.2d 904 (1st Dist.1984) (maximum-daily-dose amount must be stipulated or proved and cannot be furnished to the trier of fact by judicial notice); *see also State v. Skorvanek*, 182 Ohio App.3d 615, 2009-Ohio-1709, 914 N.E.2d 418, ¶¶ 7-10 (9th Dist.) (concluding that while an expert did testify about the bulk amount, because the expert did not refer to a "standard pharmaceutical reference manual," as the second disjunct of the statutory definition of "bulk amount" requires, the state failed to prove the daily maximum dose amounts). Other districts have flatly rejected this requirement and held that the trial

court can take judicial notice of what amount constitutes the bulk amount by reference to a standard pharmaceutical reference manual and instruct the jury accordingly. *State v. Fisher*, 5th Dist. No. 05 CAA 04 020, 2006-Ohio-2201, ¶¶ 13-22; *State v. Cole*, 12th Dist. No. CA2004-01-007, 2005-Ohio-2274, ¶¶ 29-30; *see also State v. Drummond*, 3d Dist. No. 16-11-08, 2012-Ohio-1468, ¶ 15.

**{¶48}** In response to appellant's argument under this assignment of error, the state cites this court's decision in *State v. Mitchell*, 7th Dist. No. 08 JE 5, 2008-Ohio-6920, a case which it asserts contained "similar" testimony from an analyst from BCI establishing the bulk amount of oxycodone as six 80 milligram tablets. Indeed, in *Mitchell*, the state did present evidence that the bulk amount of oxycodone was six 80 milligram tablets.

**{¶49}** In *Mitchell*, a forensic scientist explained how the bulk amount is set by the Ohio State Board of Pharmacy when they determine based upon dosage how much a person can ingest in one day. She specifically testified that the bulk amount of 80 milligram Oxycontin tablets is six tablets. She also specified that the daily dosage provided by the state pharmacy board is ninety milligrams. She then applied the statutory definition in R.C. 2925.01(D)(1)(d) of five times the maximum daily dosage to arrive at 450 milligrams, which bulk amount threshold is less than the 480 milligrams contained in six 80 milligram tablets.

**{¶50}** In this case however, unlike in *Mitchell*, the state never elicited such "similar" or any testimony at all concerning the maximum daily dose. Acurio testified that one of the tablets constituted a unit dose. (Trial Tr., Vol. IV, 849.) On cross-examination, Acurio testified that an 80 milligram tablet of oxycodone was on the higher end level of concentration. (Trial Tr., Vol. IV, 855.) However, at no point did she ever talk about the maximum daily dose or the bulk amount. And neither did DiPietro.

**{¶51}** When the trial court was instructing the jury on the amount enhancement, he told the jury that the bulk amount equaled or exceeded six unit doses. As indicated, while some appellate districts have allowed this instruction to

stand even in the absence of the evidence establishing what amount constitutes the maximum daily dose, in those cases the trial court had relied on a standard pharmaceutical reference manual. In this instance, it is unclear how the trial court arrived at its definition of the bulk amount.

**{¶52}** Because this case involves the complete absence of any basis for or evidence explaining what constituted the maximum daily dose of oxycodone, we are not called upon to hold whether the maximum daily dose must be established by expert testimony or can be arrived at through judicial notice of a standard pharmaceutical reference manual. However, the implication of our analysis of the sufficiency of the evidence in *Mitchell* as it pertained to the maximum daily dose would seem to indicate that expert testimony would be the most sound way to establish that fact.

**{¶53}** In sum, since there was no basis for establishing the maximum daily dose in this case, testimonial or otherwise, we conclude that there was insufficient evidence to prove the bulk-amount penalty enhancement aspect of appellant's convictions on counts 14 and 15. As indicated, however, the state presented sufficient evidence and appellant's underlying convictions for drug trafficking (absent the bulk-amount penalty enhancement) were not against the manifest weight of the evidence. "When the evidence shows that a defendant was not guilty of the crime for which he was convicted, but was guilty of a lesser degree of that crime or a lesser-included offense of that crime, we can modify the verdict accordingly, and remand the case for resentencing." *State v. McCoy*, 10th Dist. No. 07AP-769, 2008-Ohio-3293, 2008 WL 2588568, ¶ 28. *Accord State v. Davis*, 1st Dist. No. C-040411, 2006-Ohio-4599, 2006 WL 2572089, ¶ 13. Because the state proved that appellant sold less than the bulk amount of oxycodone, he was guilty of fourth-degree felony drug trafficking. Thus, appellant's second assignment of error has merit and his convictions on count 14 (drug trafficking) and count 15 (drug trafficking) are reversed and the case is remanded for the trial court to enter convictions on the lesser included offense of fourth-degree felony drug trafficking and to resentence appellant

accordingly.

### Enterprise

**{¶54}** Appellant's third assignment of error states:

The trial court erred and violated Zoltan Kozic's rights to due process and a fair trial when, in the absence of sufficient evidence and against the manifest weight of the evidence, it convicted him of engaging in a pattern of corrupt activity under R.C. 2923.32. Fifth and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. (September 2, 2011 Judgment Entry of Sentencing); (October 19, 2011 Amended Judgment Entry of Sentencing).

**{¶55}** This assignment of error involves the Ohio's Corrupt Activity Act, R.C. 2923.31 et seq., patterned after the federal RICO Act. Appellant and his codefendants were charged with engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1). R.C. 2923.32(A)(1) provides: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *."

**{¶56}** Appellant argues that there was insufficient evidence of an "enterprise" in this case. Appellant claims there was never sufficient evidence presented at trial to establish the existence of an enterprise because it was not demonstrated that there was an ongoing organization, formal or informal, that operated as a continuing unit and had an organizational structure separate and apart from the pattern of corrupt activity. Appellant's argument implicitly urges us to adopt the requirements for finding an enterprise as they have developed under the federal RICO statute, citing *United States v. Riccobene*, 709 F.2d 214 (3rd Cir.1983), and *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.1982), when analyzing Ohio's engaging in a pattern of corrupt activity statute.

**{¶57}** *Riccobene* identified three elements that must be proven for finding that

an enterprise exists: (1) an ongoing organization, (2) with associates that function as a continuing unit, (3) that has a structure separate and apart, or distinct, from the racketeering activity. *Riccobene* at 222-223. *See also Bledsoe* at 664 (holding "enterprise" element requires proof of a structure separate from the racketeering activity).

**{¶58}** Ohio's Corrupt Activity Act defines enterprise as follows:

> "Enterprise" includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons *associated in fact* although not a legal entity. "Enterprise" includes illicit as well as licit enterprises.

(Emphasis added.) R.C. 2923.31(C).

**{¶59}** Both *Riccobene* and *Bledsoe* relied on *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), in which the United States Supreme Court explained enterprise as "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct" that is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."

**{¶60}** In Ohio, the Tenth District adopted the *Riccobene* test in *State v. Teasley*, 10th Dist. Nos. 00AP-1322, 00AP1323, 2002 WL 977278 (May 14, 2002). This Court has yet been required to define enterprise for purposes of Ohio's engaging in a pattern of corrupt activity statute.

**{¶61}** However, in 2009, it is important to note that the United States Supreme Court decided *Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). The *Boyle* decision effectively eliminated the third factor set forth in *Riccobene*. The Third Circuit, which had decided *Riccobene*, acknowledged in *United State v. Bergrin*, 650 F.3d 257 (3rd Cir.2011), that *Riccobene* had been overruled by the United States Supreme Court's decision in *Boyle*.

**{¶62}** In *Boyle*, the Court added that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* at 939. The Court effectively rejected the third factor of the *Riccobene* test and also listed a number of structural elements that the government need *not* prove to establish an "enterprise":

> We see no basis in the language of RICO for the structural requirements that petitioner asks us to recognize. As we said in *Turkette,* an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Boyle*, 556 U.S. at 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265.

**{¶63}** Given that the definition provided by the Court in *Boyle* is more in agreement with Ohio's version of the federal RICO statute and effectively eliminates the third factor set forth in *Riccobene,* we decline to incorporate that factor into Ohio's

definition of enterprise. Additionally, other Ohio appellate court districts which have had occasion to address the matter have adopted the definition provided by the Court in *Boyle*. *State v. Dodson*, 12th Dist. No. CA2010-08-191, 2011-Ohio-6222; *State v. Perry*, 11th Dist. No. 2011-L-125, 2012-Ohio-4888.

**{¶64}** Applying the test outlined in *Boyle*, there was sufficient evidence presented to support the existence of an enterprise. There was testimony that appellant and his codefendant, Jamie Kozic, participated in numerous burglaries together. They rode together in the same vehicle to different homes. They broke into the homes together. They removed items from the home together and took them back to the same vehicles. They each later sold the items at the same pawn shop. And the burglaries occurred over the span of months from late 2009 to early 2010.

**{¶65}** In sum, the evidence presented five instances of the enterprise (appellant and his codefendant, Jamie Kozic) engaging in distinct criminal acts (burglary) over a period of several months. Appellant was directly involved in every incident of that corrupt activity.

**{¶66}** Accordingly, appellant's third assignment of error is without merit.

### Joinder

**{¶67}** Appellant's fourth assignment of error states:

> The trial court violated Zoltan Kozic's due process rights and abused its discretion, when it failed to sever Mr. Kozic's trial from that of his co-defendant. Fifth and Fourteenth Amendments, United States Constitution, and Section 10, Article I, Ohio Constitution. (June 17, 2011 Judgment Entry); (Trial Transcript, at 77, 107-108).

**{¶68}** An appellate court will only reverse a trial court's denial of severance if the trial court abused its discretion. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 33.

**{¶69}** If it appears that a defendant is prejudiced by the joinder of offenses or defendants, the trial court may grant a severance. Crim.R. 14. But the burden is on

the defendant to prove prejudice and to prove that the trial court abused its discretion in denying severance. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E2d 959, ¶ 29.

**{¶70}** "[J]oinder of defendants is proper so long as all defendants participated in the same series of transactions leading to the charges even though not all defendants participated in every act. * * * Not all defendants need be charged in each count * * * nor would differing levels of culpability among defendants necessarily justify severance." *State v. Bundy*, 7th Dist. No. 02 CA 211, 2005-Ohio-3310, ¶ 53, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 88-89, 564 N.E.2d 54 (1990).

**{¶71}** "Joinder of defendants and the avoidance of multiple trials is favored in the law for many reasons. Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980). "The test is 'whether a joint trial is so manifestly prejudicial that the trial judge is required to exercise his or her discretion in only one way – by severing the trial. * * * A defendant must show clear, manifest and undue prejudice and violation of a substantive right resulting from failure to sever. * * *.'" *Schiebel* at 89, 564 N.E.2d 54, quoting *United States v. Castro*, 887 F.2d 988, 996 (9th Cir.1989).

**{¶72}** The trial court did not abuse its discretion when it denied appellant's motion for severance of defendants. Six of the nine burglary counts involved both appellant and his codefendant Jamie Kozic. But, as *Schiebel* states, not all defendants need to be charged with each count to join defendants for trial. *Id.* at 89, 564 N.E.2d 54. Since each of the counts in the indictment arose from the same series of transactions, the trial court did not abuse its discretion when it allowed a joint trial.

**{¶73}** Furthermore, the trial court instructed the jurors that they should consider the evidence against each of the defendants separately. And when discussing the law concerning each offense, it specified the defendants charged with

those offenses. The jury is presumed to have followed the trial court's limiting instructions. *State v. Raglin,* 83 Ohio St.3d 253, 264, 699 N.E.2d 482 (1998). Also, appellant has not attempted to argue that he would have defended his case differently if the other defendants had not been joined. *See State v. Johnson,* 88 Ohio St.3d 95, 110, 723 N.E.2d 1054 (2000); *State v. Franklin*, 62 Ohio St.3d 118, 123, 580 N.E.2d 1 (1991); *State v. Stephens*, 4th Dist. No. 98CA41, 1999 WL 1285879 (Dec. 23, 1999).

**{¶74}** Turning to the joinder of offenses, Crim.R. 8(A) provides that two or more offenses may be charged in the same indictment if the offenses are (1) of the same or similar character, or (2) are based on the same act or transaction, or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or (4) are part of a course of criminal conduct. "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981).

**{¶75}** When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct. *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992).

**{¶76}** When simple and distinct evidence exists, an accused is not prejudiced by the joinder of multiple offenses in a single trial, regardless of whether the evidence is admissible as other-acts evidence. *State v. Coley*, 93 Ohio St.3d 253, 260, 754 N.E.2d 1129 (2001).

**{¶77}** In this case, the trial court did not abuse its discretion in denying severance of the offenses. All of the offenses with which appellant was charged with were not necessarily of a same or similar character. However, all of the burglaries and drug sales clearly constituted (1) two or more acts or transactions connected

together or constituting parts of a common scheme or plan, or (2) were part of a course of criminal conduct. Crim.R. 8(A).

**{¶78}** Here, the evidence of the other crimes would likely not have been admissible if the counts were severed. The crimes each had their own distinct victim-witnesses and it was unlikely that the victim-witnesses would testify in a case that did not have to do with the offense against them.

**{¶79}** Nonetheless, the evidence of each crime was simple and distinct. Each of the witnesses who had been a victim of one of the alleged burglaries simply testified regarding that particular offense. None of their testimonies were very long or involved.

**{¶80}** Moreover, the jury was able to separate the evidence as to each of the charged offenses. The jury found appellant's codefendant Jamie Kozic guilty of some counts but not others. The jury's verdicts demonstrate that they were able to consider the evidence independently as it pertained to each individual charge and did not lump the charges together.

**{¶81}** Accordingly, appellant's fourth assignment of error is without merit.

### Speedy Trial

**{¶82}** Appellant's fifth assignment of error states:

The trial court violated Zoltan Kozic's speedy-trial rights and abused its discretion, when it failed to grant Mr. Kozic's motion to dismiss. Sixth Amendment, United States Constitution, and Section 10, Article I, Ohio Constitution; R.C. 2945.71; R.C. 2945.72; R.C. 2945.73. (Trial Transcript. at 107).

**{¶83}** Ohio recognizes both a constitutional and a statutory right to a speedy trial. *State v. King*, 70 Ohio St.3d 158, 161, 637 N.E.2d 903 (1994); *see also* Sixth Amendment, United States Constitution; Section 10, Article I, Ohio Constitution. The Sixth Amendment of the U.S. Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The

General Assembly has embodied this fundamental right in the provisions of R.C. 2945.71 to 2945.73. R.C. 2945.71; R.C. 2945.72; R.C. 2945.73. Thus, the Ohio Supreme Court has found the statutory speedy-trial provisions set forth in R.C. 2945.71 to be coextensive with constitutional speedy-trial provisions. *State v. O'Brien*, 34 Ohio St.3d 7, 9, 516 N.E.2d 218 (1987).

**{¶84}** R.C. 2945.71 provides the timeframe for a defendant's right to a speedy trial based on the level of offense. As indicated earlier, appellant was ultimately indicted on seventeen felony counts. According to the Ohio Revised Code, "a person against whom a charge of felony is pending shall be brought to trial within two hundred seventy days after his arrest." R.C. 2945.71(C)(2). However, each day the defendant spends in jail solely on the pending criminal charge counts as three days. R.C. 2945.71(E).

**{¶85}** R.C. 2945.72 lists a number of tolling events that may extend the period of time in which the prosecution must bring a defendant to trial. R.C. 2945.72(A)-(I). If the state fails to meet the statutory time limits, then the trial court must discharge the defendant. R.C. 2945.73. The Ohio Supreme Court has "imposed upon the prosecution and the trial courts the mandatory duty of complying" with the speedy-trial statutes. *State v. Singer*, 50 Ohio St.2d 103, 105, 362 N.E.2d 1216 (1977). As such, the speedy-trial provisions are strictly construed against the state. *Brecksville v. Cook*, 75 Ohio St.3d 53, 57, 661 N.E.2d 706 (1996); *Singer* at 105, 362 N.E.2d 1216.

**{¶86}** Consequently, the role of the reviewing court is to count the days of delay chargeable to either side and determine whether the case was tried within the time limits set forth in the Revised Code. *State v. Hart*, 7th Dist. No. 06 CO 62, 2007-Ohio-3404, at ¶ 8-9, citing *State v. High*, 143 Ohio App.3d 232, 757 N.E.2d 1176 (7th Dist.2001). Moreover, this duty is not affected by whether the state raised certain filings as tolling events. *State v. Williams*, 7th Dist. No. 07 MA 162, 2008-Ohio-1532, at ¶ 38.

**{¶87}** Upon demonstrating that the statutory time limit has expired, the defendant has established a prima facie case for violation of his speedy-trial rights,

thereby warranting dismissal. *State v. Butcher*, 27 Ohio St.3d 28, 30-31, 500 N.E.2d 1368 (1986). If the defendant can make this showing, the state then has the burden to establish any exceptions that may have suspended the speedy-trial clock. *Butcher* at 31, 500 N.E.2d 1368. As such, the resolution of appellant's assigned error requires scrutinizing the record to ascertain the tolling potential of each filing event.

**{¶88}** To begin, appellant was indicted on May 20, 2010. Normally, the speedy-trial clock begins to run on the day following the date of arrest or service of the summons or indictment. R.C. 2945.71(C)(2); *State v. Catlin,* 7th Dist. No. 06BE21, 2006-Ohio-6246, ¶ 12. However, when appellant was indicted, he was already in jail for another case. In Mahoning County Common Pleas Court Case No. 2009CR461, appellant had pleaded guilty to attempted drug possession in violation of R.C. 2925.11(A)(C)(1)(a) and R.C. 2923.02(A), a first-degree misdemeanor, and, on July 16, 2009, was sentenced to a thirteen-month term of community control. On April 20, 2010, he was held without bond following his stipulation to probable cause that he had violated the terms of his community control. On May 21, 2010, the day after his indictment in this case, the trial court in that case sentenced appellant to 120 days in jail for violating the terms of his community control, with credit for 37 days already served. Thus, appellant was being held in jail for the next 83 days or until August 12, 2010, for his community-control violation in that case.

**{¶89}** It is important to note that the triple-count provision applies only when the defendant is being held in jail solely on the pending charge. *State v. MacDonald*, 48 Ohio St.2d 66, 357 N.E.2d 40 (1976), paragraph one of the syllabus (construing former R.C. 2945.71(D), now (E)). Therefore, the triple-count provision does not apply when a defendant is being held in custody pursuant to other charges. *Id.* Nor does it apply when the accused is being held on a parole- or probation-violation holder. *State v. Brown*, 64 Ohio St.3d 476, 479, 597 N.E.2d 97 (1992) (parole-violation holder); *State v. Martin*, 56 Ohio St.2d 207, 211, 383 N.E.2d 585 (1978) (probation-violation holder). In appellant's case then, while the speedy-trial clock began to run on May 21, 2010, the day after he was indicted, each of the 83 days

that elapsed between then and when he was being held solely on the charges in this case counted only as one day (tolling events aside). Thereafter, the triple-count provision applied as he remained in jail on this case until his trial on August 1, 2011.

**{¶90}** Appellant's speedy-trial clock was tolled early at 104 days when he filed for discovery and a motion for a bill of particulars on May 27, 2010 (applying the triple-count provision to the 7 days that elapsed between May 21, 2010, and May 27, 2010 plus the 83 days that had already accrued from May 21, 2010, until August 12, 2010).

**{¶91}** The next and major tolling event occurred on July 1, 2010, at a pretrial hearing, where the parties agreed that the first available trial date was February 7, 2011. The entry specifically states, "Speedy trial tolled until this time." It is well established that any period of delay "made or joined in by appellant" may toll the speedy-trial clock. *State v. Barbour*, 10th Dist. No. 07AP-841, 2008-Ohio-2291, at ¶ 16-18. "When the parties agree to a continuance, even if it is not on the motion of the defendant, the continuance is presumptively reasonable and there is no need to explain the reason for the continuance on the record." *State v. Freeman*, 7th Dist. No. 08 MA 81, 2009-Ohio-3052, at ¶ 50 (overruled on other grounds); *see also State v. Rupp*, 7th Dist. No. 05MA166, 2007-Ohio-1561, at ¶ 108. Additionally, it is well-settled that a defendant's speedy-trial right may be waived by defense counsel for extensions to prepare for trial, as well as conflicts in defense counsel's schedule. *State v. McBreen*, 54 Ohio St.2d 315, 376 N.E.2d 593, (1978). That waiver applies even if it is made without the defendant's consent. *State v. Stanley*, 7th Dist. No. 03 MA 42, 2004-Ohio-6801, ¶ 30, citing *McBreen*, 54 Ohio St.2d at 320. Thus, as of the day before that pretrial hearing, June 30, 2010, the speedy-trial clock remained tolled at 104 days.

**{¶92}** Meanwhile (before the scheduled trial date of February 7, 2011), appellant filed some motions which could be construed as serving as an additional basis to toll the speedy-trial clock. On August 17, 2010, appellant filed a motion to amend bond. On November 23, 2010, appellant filed a second request for a bill of

particulars and second motion to amend bond.

**{¶93}** Following a motion filed by his co-defendant, Jennifer Kozic, appellant agreed to a continuance of the trial from February 7, 2011, until February 28, 2011. Due to a deterioration in the relationship between appellant and his court-appointed counsel, the court appointed appellant new counsel which necessitated a further delay. At a March 4, 2011 status conference, the parties agreed to a continuance of the trial until August 1, 2011, the date on which the trial commenced. Therefore, appellant's speedy-trial clock was tolled from July 1, 2010 until August 1, 2011, the first day of trial. Since only 104 of the 270 days of the speedy-trial clock had elapsed, appellant was brought to trial within time.

**{¶94}** Accordingly, appellant's fifth assignment of error is without merit.

**{¶95}** In sum, appellant's first, third, fourth, and fifth assignments of error are without merit and are overruled. Appellant's second assignment of error is found to be with merit and is sustained. The judgment of the trial court is affirmed in part and is reversed in part. Appellant's convictions on count 14 (drug trafficking) and count 15 (drug trafficking) are reversed and the case remanded for the trial court to enter convictions on the lesser included offense of fourth-degree felony drug trafficking and to resentence appellant accordingly. The remainder of appellant's convictions and sentences are affirmed.

Vukovich, J., concurs.

DeGenaro, P.J., concurs.